**Kenneth J. THOMAS, Plaintiff,**

v.

**ISTAR FINANCIAL, INC. and Ed Baron, Defendants.**

**No. 05 Civ. 606(VM).**

United States District Court,
S.D. New York.

July 7, 2006.

Gallet Dreyer & Berkey, LLP, New York, NY, for Kenneth J. Thomas.

David O. Simon, Steven M. Latino, Robyn Kim Ruderman, Epstein Becker & Green, P.C., New York, NY, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

### I. INTRODUCTION

Plaintiff Kenneth Thomas ("Thomas") brings this action against his former employer, iStar Financial, Inc. ("iStar") and iStar Vice President of Administration and Operations, Ed Baron ("Baron") (collectively, "Defendants"), alleging unlawful race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq. and the New York City Human Rights Law ("NYCHRL"). Thomas alleges that Defendants (1) terminated him on the basis of race, (2) created a hostile work environment, and (3) retaliated against him for complaining about discriminatory treatment. Defendants moved for summary judgment on all claims. For the reasons described below, the Court grants in part and denies in part Defendants' motion for summary judgment.

### II. BACKGROUND [1]

Thomas, who is African–American, began working for iStar, a publicly traded

---

[1]. The factual summary presented herein derives primarily from the following documents: Complaint, *Thomas v. iStar Financial, Inc.*, No. 05 Civ. 606, dated Jan. 14, 2005; Defendants' Memorandum of Law in Support of Its Motion to Dismiss and/or for Summary Judgment, dated Dec. 15, 2005 ("Def. Mem."); Defendants' Rule 56.1 Statement, dated Dec. 15, 2005; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Sum-

real estate finance company, in May 2000 as a temporary employee. In June 2000, iStar Senior Vice President and Controller Colette Tretola ("Tretola") hired Thomas as a permanent employee in the accounts payable department. Thomas's duties included paying and processing invoices, obtaining prior approval of invoices before processing, verifying that invoices had not already been paid, entering invoices into the accounts payable computer system and generating checks for signature. In March 2001, Tretola promoted Thomas to Accounts Payable Manager; he was also assigned an assistant, Amy Aldridge–Carlson ("Carlson"). Thomas continued to work in that capacity until August 2003, when his employment was terminated. Carlson, a white woman, replaced Thomas as Accounts Payable Manager upon his termination.

## A. THOMAS'S PERFORMANCE AT iSTAR

The parties strongly dispute the quality of Thomas's work performance at iStar and the circumstances of his termination. Defendants contend that Thomas made frequent errors in his work, including failing to timely process and pay invoices, preparing checks for the wrong vendor or dollar amount, processing and paying invoices more than once, and coding invoices incorrectly. They assert that Tretola and iStar Assistant Controller Collin Cochrane ("Cochrane") met with Thomas on various

occasions to discuss his poor job performance, and that Tretola assigned Carlson as an assistant to Thomas to help with his work performance issues.

According to Defendants, Thomas's performance did not improve and three final incidents in August 2003 led to his termination: (1) Thomas addressed a check for a member of iStar's Board of Directors to the wrong address, resulting in the check arriving at the wrong location; (2) Thomas acted in a rude and insubordinate manner when iStar's Director of Lease Administration Nancy Zoeckler ("Zoeckler") requested immediate assistance on a project; and (3) Thomas mistakenly requested approval for payment of monthly invoices for rent on iStar's corporate apartment in an amount that was three times the correct amount.[2] Defendants assert that Tretola decided to terminate Thomas following these incidents based on her observations of his poor work performance throughout his time at iStar and complaints she had received from senior officers and managers.

Thomas, on the other hand, maintains that his work performance throughout his employment at iStar was "excellent" and that he was verbally praised by his supervisors each year. He includes his performance appraisal for January to December 2002 in which he received a rating of "B" ("good, solid performer") for execution of his work tasks. (See Employee Grades,

mary Judgment, dated Jan. 30, 2006 and exhibits attached thereto ("Pl. Mem."); Affidavit of Ken Thomas, dated Jan. 23, 2006 ("Thomas Aff."); Plaintiff's Statement of Material Facts, dated Jan. 30, 2006 ("Pl. SOF"); Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment, dated Feb. 21, 2006; and Defendants' Responses to Plaintiff's Statement of Material Facts, dated Feb. 21, 2006. Except where specifically referenced, no further citation to these sources will be made.

2. Defendants contend that Thomas submitted three rent invoices for payment, in the following values: (1) the amount due for July rent, (2) the amount due for July and August rent, and (3) the amount due for July, August, and September rent. Defendants contend that Thomas intended to pay the full value of each invoice, which would have resulted in triple-paying the amount due for July, and double-paying the amount due for August.

undated, attached as Exhibit 71 of Pl. Mem.) He also includes documentation that he was given raises and bonuses based on performance each year of his employment and notes that he was promoted to Accounts Payable Manager. Thomas attributes any errors in invoice processing to iStar's poor procedural systems and to intentional efforts by Baron to target him for criticism.

Thomas specifically disputes Defendants' account of the three incidents described above. He asserts that (1) another employee, Gerri Geniblazo, inputted the wrong address for the board member and mailed the check; (2) he was not rude or insubordinate to Zoeckler but explained he would need additional assistance to complete the project, and was later praised for his performance; and (3) he never intended to triple-pay rent on the corporate apartment; he planned to prepare one check to cover rent for three months. Thomas asserts that Baron was involved in creating these "issues" and reporting them to Thomas's supervisors.

Thomas further disputes that Tretola alone made the decision to terminate his employment. Instead, Thomas contends that Baron intentionally targeted him for termination based on racial hostility, complained about Thomas to his supervisors without justification, and actively participated in the termination process.

## B. ALLEGED RACIAL HOSTILITY

Thomas outlines a series of incidents he believes reveal Baron's racial animus toward blacks in general and Thomas in particular. Thomas alleges that Baron: told him when they first met, "well you may like me now, but come a month from now you will hate my guts"; asked Thomas personal questions about how he could afford to pay for a Jaguar automobile, a house, and child support; told black employees including Thomas, when introducing himself, that he could identify with their ethnicity, knew what it was like to grow up poor, that some of his best friends are black, and that he came from where they came from and grew up in the "hood," poor and on welfare; told Thomas that his daughter looked like a "black dot" in a company picnic photo; asked Thomas why he was friends with a Hispanic employee, calling her a "street rat"; told Thomas, with regard to a Hispanic vendor, that he did not like dealing with "those Mexicans"; called former iStar employee Jama Clark ("Clark") a "nigger," and told her she had to try harder because she is black. (*See* Thomas Aff. at 30–32.)

Thomas also contends that Baron generally targeted black employees at iStar for criticism, including Human Resources Manager Ayanna Shanks ("Shanks"), and was involved in firing several black employees in various iStar offices. According to Thomas, Baron also would regularly call him into his office to "interrogate" him about various issues and on one occasion falsely accused him of having sexually harassed another employee. (*Id.* at 32.) Thomas adds that Baron regularly criticized him to his supervisors, caused Thomas to pay invoices late by deliberately withholding the invoices, and told Carlson that he would "get rid of" Thomas if she was unhappy. (*Id.* at 31–33.)

Thomas alleges that iStar accountant Jay Agarwal ("Agarwal") also made inappropriate racial comments. According to Thomas, Agarwal: addressed Thomas on one occasion by saying, "What's up my Nigger?"; used the word "nigger" in phone conversations; tried to tell Thomas "nigger jokes"; called black women he saw on pornography websites "bitches"; told Thomas and Shanks they looked like Al Sharpton; asked Thomas, when Thomas went on a smoking break, whether he was

smoking crack; asked Thomas if the hair between his legs was the same as the hair on his head; and told Thomas he thought only ninety-five percent of blacks are bad and that Thomas must be in the other five percent. (*See* Thomas Aff. at 36–37.)

Thomas further alleges that Zoeckler referred to him as a "black hole," and that Carlson told him she did not like working for a black man and that Baron was going to fire him because he was black. (*See* Thomas Aff. at 34, 42.)

Thomas reports that he made informal complaints about his treatment to his supervisors on numerous occasions, and alleges that Defendants retaliated against him in various ways for doing so, including by terminating his employment.

Defendants deny that the majority of the alleged discriminatory incidents occurred and that Thomas complained about the alleged discriminatory treatment.[3]

## C. *THOMAS'S COMPLAINTS*

Thomas's alleged informal complaints to supervisors are outlined in varying degrees of specificity. Around June 2000, Thomas complained to Accounting Department Manager Andrew Barker ("Barker") that Baron had accused him of being involved in check fraud and blamed him first whenever something was lost. Sometime around August 2001, Thomas complained to iStar Assistant General Counsel and Vice President Geoff Dugan ("Dugan") about Baron's alleged reference to Thomas's daughter as a "little black dot," and his sense that Baron was generally harassing him. Dugan allegedly told Thomas to let it "roll off [his] shoulder," and spoke to Baron about the incidents. (Thomas Aff. at 36.) Following this complaint, Thomas

reports he heard Baron tell an administrative assistant that he would "get rid of" Thomas. (*Id.*) In August 2002, Thomas complained to Barker and Shanks about the alleged incident in which Agarwal called Thomas a "nigger." Barker responded to the complaint by speaking to Agarwal about the incident behind closed doors. Agarwal then reportedly told Thomas he did not care who Thomas complained to since Thomas was on a "five-year plan." (Thomas Aff. at 37.)

Thomas also mentions other instances in which he complained about harassment from Baron, without specifying when the complaints were made. Sometime shortly after starting to work with Baron, Thomas complained to Barker and Shanks that he felt Baron's comments about knowing what it was like to grow up in the "hood" were stereotyping and belittling. Thomas alleges that their response was to instruct him to concentrate on his job. Thomas also alleges that he complained to Barker and Tretola about Baron having falsely accused him of sexually harassing another employee. After that, Baron reportedly told Carlson that he wanted to "get rid of" Thomas because Thomas was "creating problems." (Thomas Aff. at 33.) Thomas also reportedly complained to Tretola about Baron harassing him. Tretola allegedly assured him that she would handle the problem. According to Thomas, "every time I complained about Ed Baron, the situation would get worse, and Ed Baron would start treating me even worse." (Thomas Aff. at 35.) Defendants deny that Thomas ever made these complaints, with the possible exception of the complaints involving Agarwal.

In November 2003, Thomas filed a formal complaint with the Equal Employment

---

**3.** Defendants agree that Baron made statements about identifying with Thomas and knowing what it was like to grow up poor, but they contend he did so only after Thomas volunteered information about his personal circumstances.

Opportunity Commission (EEOC) and in November 2004, received a "Right to Sue" letter from the EEOC.

## III. *LEGAL STANDARD*

### A. *SUMMARY JUDGMENT*

The Court may grant a motion for summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this assessment, the Court looks to the relevant substantive law to determine which facts are material: "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To survive summary judgment, the disputed factual issues must also be "genuine"—that is, "sufficient evidence [must] favor the non-moving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the non-moving party must provide "specific facts showing that there is a genuine issue for trial" in order to survive the motion for summary judgment. Fed.R.Civ.P. 56(e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Shannon v. New York City Transit Auth.,* 332 F.3d 95, 98–99 (2d Cir.2003).

In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Dallas Aero., Inc. v. CIS Air Corp.* 352 F.3d 775, 780 (2d Cir.2003). The Court must refrain, however, from weighing the evidence and resolving the merits of disputed questions, and instead restrict its inquiry to whether triable issues of material fact exist. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

### B. *TITLE VII CLAIMS*

Defendants moved for summary judgment on all of Thomas's claims, noting that the same standard of analysis that applies to his claims Title VII also applies to those under NYCHRL. *See Batka v. Prime Charter, Ltd.* 301 F.Supp.2d 308, 312, n. 4 (S.D.N.Y.2004) ("Claims of employment discrimination brought under the ... NYCHRL are analyzed under the same *McDonnell Douglas* framework as Title VII claims.") (*citing Weinstock v. Columbia Univ.,* 224 F.3d 33, 42, n. 1 (2d Cir. 2000)). Thus, the Court's determination that certain of Thomas's Title VII claims do not survive summary judgment also results in dismissal of the corresponding NYCHRL claims.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). This anti-discrimination provision provides the basis for Thomas's termination and hostile work environment claims. Title VII also prevents employers from retaliating against employees who "opposed any practice made an unlawful employment practice by this title" or who "made a charge, testified, assisted, or par-

ticipated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e–3(a). This anti-retaliation provision serves as the basis for Thomas's retaliation claim and is discussed in more detail in Section IV.C below.

The sufficiency of a Title VII discrimination claim is assessed under the three-step burden-shifting analysis outlined by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff must first establish a prima facie case of discrimination. To do so, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he is qualified for the position in question; (3) he suffered an adverse employment action; and (4) the surrounding circumstances give rise to an inference of discrimination based on the plaintiff's membership in the protected class. *See Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 767 (2d Cir.2002); *see also Thomas v. Westchester County Health Care Corp.*, 232 F.Supp.2d 273, 278 (S.D.N.Y.2002). The plaintiff's burden in establishing a prima facie case is "de minimis." *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 380–81 (2d Cir.2001) (citations omitted); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir.2001).

If the plaintiff makes out a prima facie case, discrimination is presumed and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the alleged adverse employment action. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant meets this burden, the presumption of discrimination is rebutted and the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's proffered reasons were merely a pretext for discrimination and that its conduct under the circumstances gives rise to an inference of unlawful discrimination. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir.2001).

■ A plaintiff opposing summary judgment must present sufficient evidence of discriminatory intent underlying the defendant's action. It is not necessary for the plaintiff to show that defendant's asserted non-discriminatory reasons played no role, but rather that discriminatory reasons were "at least one of the motivating factors." *Vergara v. Yonkers Pub. Schs.*, 386 F.Supp.2d 377, 384–385 (S.D.N.Y.2005) (internal quotations omitted).

While courts are hesitant to resolve discrimination claims on summary judgment because the employer's intent is often disputed, summary judgment is appropriate where the non-moving party's evidence is "so scant that a rational jury cannot find in its favor." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996) (citation omitted).

## IV. DISCUSSION

### A. TERMINATION

■ The Court concludes that Thomas has produced sufficient evidence to establish his prima facie case of discriminatory termination. There is no dispute that Thomas is a member of a protected class under Title VII, based on his race, and that he suffered an adverse employment action by reason of his termination. The parties do dispute whether Thomas has established the remaining two criteria for a prima facie case: qualification for his position, and circumstances giving rise to an inference of discrimination.

■ The requirement that a plaintiff be qualified should not be measured by a

plaintiff's subjective assessment of his own qualifications. *See Dawson v. Bumble & Bumble,* 246 F.Supp.2d 301, 321 (S.D.N.Y. 2003), *aff'd,* 398 F.3d 211 (2d Cir.2005). Instead, the standard should be gauged against the employer's specified criteria, including whether plaintiff demonstrated "satisfactory job performance" at the time of his termination. *Thornley v. Penton Publ'g, Inc.,* 104 F.3d 26, 29 (2d Cir.1997). *See also Smith v. K & F Indus.,* 190 F.Supp.2d 643, 648 (S.D.N.Y.2002).

Defendants contend that Thomas failed was not qualified for his position because he was not meeting iStar's "legitimate expectations." (Def. Mem. at 8.) They contend that Thomas made many errors and received a verbal warning for his poor performance. In response, Thomas notes that his performance review by Tretola for the year 2002 provided a rating of "B" ("good, solid performer") for execution of work tasks. He also notes that he was given raises and bonuses each year of his employment at iStar. Furthermore, he notes that he was promoted and given an assistant. These objective measures indicate job performance that was at least satisfactory to iStar. As such, the Court is persuaded that Thomas has submitted enough evidence of qualification to establish the existence of disputed material issues as to this element of the analysis.

■ With regard to circumstances indicating discrimination, Defendants assert that the termination was based entirely on Thomas's poor job performance. Defendants also assert that Tretola alone made the decision to terminate Thomas and that there is no indication of discrimination on her part. Thomas primarily points to his replacement by a white woman as evidence of discriminatory motive for his termination. He also alleges that he was subject to disparate treatment and harassment based on race. Given the minimal standard governing this stage of the inquiry, Thomas's allegations are sufficient to give rise to an inference of discrimination and establish a prima facie case. *See Zimmermann,* 251 F.3d at 381.

■ The burden thus shifts to Defendants to articulate non-discriminatory reasons for Thomas's termination. Defendants have met their burden here. The alleged deficiencies in Thomas's performance are sufficient evidence of legitimate, non-discriminatory criteria for termination.

■ On the basis of the preceding review, the burden shifts back to Thomas to present evidence that Defendants' proffered reason for the termination—his poor job performance—is pretextual. For the purposes of the instant motion, the Court need only determine whether a genuine issue of material fact exists as to iStar's motives for terminating Thomas. The Court is persuaded that Thomas has raised a genuine issue of material fact regarding the basis for his termination.

First, Thomas submitted evidence that his job performance was at least sufficient enough to earn a solid performance review, annual raises and bonuses, and a promotion.

Thomas also suggested racial animus on the part of individuals he alleges were involved in his termination decision, namely Baron. Defendants assert that Tretola alone made the termination decision, consulting only Dugan, Cochrane, and Agarwal beforehand. The parties do agree, however, that Baron was in Tretola's office when she informed Thomas of his termination. Baron also signed Thomas's termination form. Given these circumstances, the Court considers evidence of racial hostility by Baron relevant to the issue of pretext, as

the impermissible bias of a single individual at any stage of the [terminating]

process may taint the ultimate employment decision in violation of Title VII.... This is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [terminating] process.

*Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir.1999); *see also Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107 (2d Cir.2004) (finding that negative recommendations of possibly biased supervisors played a role in ultimate decision-maker's termination decision); *Penta v. Sears Roebuck, Co.*, No. 01 Civ. 2788, 2003 WL 21143071 (E.D.N.Y. May 12, 2003) (holding that a supervisor's possible racial animus could taint entire termination process since final decision-maker relied on supervisor's opinions).

In his Statement of Facts, Thomas controverts that Tretola conferred with Agarwal before the termination, while in his Memorandum, Thomas asserts that Agarwal influenced the termination decision and was racially biased against him. (*See* Pl. SOF at 14 and Pl. Mem. at 14.) Despite this inconsistency in Thomas's submissions, the Court will nonetheless consider evidence of Agarwal's potential racial bias given his possible role in the termination decision.

■ The deposition testimony of Clark and Shanks lend some support to Thomas's allegations that Baron and Agarwal demonstrated sufficient racial bias for the purposes of this motion. Clark testified

that Baron created a racist culture at iStar. Specifically, Clark alleged that Baron told her, "they're never going to think of you as anything else but a nigger here" and falsely accused her of not having written a personnel memorandum.[4] (*See* Deposition Transcript of Jama Clark, dated Sept. 24, 2005 at 35, 41, 45.) Shanks asserted that Baron created a "hostile work environment," made false accusations against her, and caused her to initially feel he was creating problems for her and Clark because they are black (though she stated that she later came to believe that Baron merely had a harsh management style). (*See* Deposition Transcript of Ayanna Shanks, dated Sept. 9, 2006 at 41, 51, 55–56.) Shanks also testified that Agarwal once told her she looked like Al Sharpton. (*Id.* at 71.)

Affidavit and deposition testimony in opposition to summary judgment must be based on "concrete particulars," rather than "conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (*quoting Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985)); *see also* Fed. R.Civ.P. 56(e). Thus, bald assertions that Baron in general terms criticized black employees or created a racist culture are insufficient to withstand summary judgment. However, to the extent that the affidavits and depositions of Thomas, Clark, and Shanks outlined specific incidents indicating potential racial biases of Baron and Agarwal, Thomas has produced sufficient evidence to raise a genuine issue of fact as to whether discrimination moti-

---

4. The Court notes that Clark's deposition transcript is unsigned. Fed.R.Civ.P. 30(e) requires that a party or deponent be permitted to review the deposition transcript, make corrections, and sign a statement indicating what was changed, if the review is requested prior to the completion of deposition and the officer taking the deposition notes the request. But, as the Notes of Advisory Committee on 1993 amendments to Rule 30 indicate, the deponent's signature is *only* required if review is requested and corrections are made. As there is no indication that a review of Clark's deposition was requested, the Court is not barred from considering her unsigned deposition. *See Elias v. New York City Transit Auth.*, No. 95 Civ. 1083, 1997 WL 214968 at *2, n. 3 (S.D.N.Y. Apr. 28, 1997).

vated his termination. That many of Thomas's concrete assertions are uncorroborated is irrelevant at the summary judgment stage. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 78 (2d Cir.2001) (concluding plaintiff's uncorroborated statements ascribing discriminatory intent to the employer raised a genuine issue of fact); *Owens v. New York City Hous. Auth.,* 934 F.2d 405, 410 (2d Cir.1991) *cert. denied,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991) (holding that employer's argument that employee's discrimination evidence is uncorroborated "is a jury argument inappropriate on a motion for summary judgment").

■ Defendants attempt to rebut Thomas's allegations of racial bias by invoking the "same actor inference." This doctrine, which is generally applied in the context of claims under the Age Discrimination in Employment Act (ADEA), provides that when the same actor hires and also .fires a person in a protected class, there is a presumption against an inference of discrimination. *See Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997). While the parties agree that Tretola hired Thomas, they dispute which iStar employees participated in the decision to fire him. The involvement of multiple decision-makers in a termination decision does not automatically preclude application of the same actor inference. *See Jones v. Yonkers Pub. Schs.,* 326 F.Supp.2d 536, 546 (S.D.N.Y.2004) ("the [same actor] inference may be applied even when the supervisor at issue … is not the only person with input into the hiring and firing decision. The inference 'is applicable so long as one management-level employee played a substantial role in both the hiring and firing of the plaintiff.' ") (*quoting Ramos v. Marriott Int'l,* 134 F.Supp.2d 328, 346 (S.D.N.Y.2001)).

However, the inference cannot be applied in this case for other reasons.

First, the Second Circuit has not yet passed judgment on whether the same actor inference applies in the Title VII context. *See Feingold v. New York,* 366 F.3d 138, 155 n. 15 (2d Cir.2004)(deciding not to pass judgment on the applicability of the same actor inference outside the ADEA context); *Reyes v. North Shore—Long Island Jewish Health Sys.,* No. 00 Civ. 6400, 2005 WL 1941634 at *6, n. 2 (E.D.N.Y. Aug.15, 2005) (refusing to apply the same actor inference since the Second Circuit "has expressly declined to pass judgment on whether [the] 'same actor inference' applies in Title VII cases."); *but see Jones,* 326 F.Supp.2d at 546 (applying same actor inference in Title VII case).

■ Furthermore, the same actor inference does not apply when considerable time has passed between the hiring and firing. *See Feingold* at 155; *see also Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 137–138 (2d Cir.2000) (citation omitted). In the Second Circuit, the inference no longer applies when more than two years separate the hiring and firing. *See, e.g.; Campbell v. Alliance Nat'l Inc.,* 107 F.Supp.2d 234, 248 (S.D.N.Y.2000) ("Where the interim period [between hiring and firing] is under two years, the same actor inference remains significant."); *see also Hueston v. City of New York,* No. 00 CIV. 9512, 2005 WL 53256 (S.D.N.Y. Jan.10, 2005). However, even if the same actor inference were held applicable in Title VII cases, the more than three years that elapsed between Thomas's hiring and firing preclude application of the doctrine in this case. Accordingly, the record indicates the existence of a genuine issue of material fact as to whether Baron played a meaningful role in Thomas's termination and whether Baron's

alleged racial bias impermissibly influenced that determination.

## B. HOSTILE WORK ENVIRONMENT

 To establish a hostile work environment claim under Title VII, a plaintiff must first demonstrate that the defendant's conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (*quoting Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)) (internal brackets and quotations omitted). The following considerations are relevant to this determination: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance'; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir.1999) (*citing Harris*, 510 U.S. at 23, 114 S.Ct. 367); *see also Patterson v. CBS, Inc.*, No. 94 Civ. 2562, 2000 WL 666337, at *7 (S.D.N.Y. May 22, 2000); *O'Gorman v. Holland*, No. 97 Civ. 0842, 2000 WL 134514, at *6 (S.D.N.Y. Feb.3, 2000). A court must consider the totality of the circumstances and find, under a reasonable person standard, that the work environment is hostile or abusive, and that the victim subjectively perceived it as such. *See Harris*, 510 U.S. at 21–22, 114 S.Ct. 367; *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995).

 To survive summary judgment on a hostile work environment claim, a plaintiff must first show "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of ... [the plaintiff's] working environment." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir.2000) (*quoting Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000)).

 A plaintiff must next show "a specific basis for imputing the hostile work environment to the employer." *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001). Under these circumstances, "an employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

 Thomas asserts a series of incidents involving Baron and Agarwal, described in Section II.B above, that he asserts created a hostile work environment. Defendants deny that these incidents occurred. They further argue that even if the alleged incident in which Baron called Clark a "nigger" occurred, Thomas was not present when that comment was made. Finally, Defendants allege that if Agarwal made the "nigger" comment to Thomas the comment was made in a friendly context which a reasonable person would not find offensive.

Since the Court must consider the totality of circumstances in hostile work environment actions, it need not limit its inquiry to evidence of racially charged comments made in Thomas's presence or directed at him particularly. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir.1997)(holding that plaintiff's work environment can be impacted by learning second-hand of a racially derogatory comment or joke); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2d Cir.2000)(concluding that even if plaintiff

was not present during or not the target of all racial comments, "a jury plausibly could find that [defendant's] persistently offensive conduct created an overall 'hostile or abusive environment' which exacerbated the effect of the harassment [plaintiff] experienced individually." (internal citation omitted)).

That being said, "a district court deciding a summary judgment motion must be provided with *admissible* evidence demonstrating the truth of the non-movant's assertions." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71–72 (2d Cir.2000)(emphasis added). As such, a court need not consider unsubstantiated assertions, *Schwapp*, 118 F.3d at 111, or inadmissable hearsay, such as allegations not supported by affidavits. *See Howley v. Town of Stratford*, 217 F.3d 141, 155 (2d Cir.2000). Thomas's statements that Baron generally targeted iStar's black employees for criticism or harassment are not supported by affidavits or depositions from any employees, with the exception of Ayanna Shanks and Jama Clark. Shanks alleges some incidents that might be construed as race-based harassment, but the force of her testimony is somewhat undercut insofar as she ultimately concludes that Baron simply had an abrasive management style.

On the other hand, Clark's deposition testimony about Baron calling her a "nigger" would be admissible and relevant if Thomas knew about the incident while still employed at iStar. Thomas contends that after Baron joined iStar, Clark told him that Baron was abusing and harassing her and that Baron called her a "nigger." Thomas does not specify the date when this conversation occurred. Although Clark testified that she did not tell anyone at iStar about the incident while employed there, it is possible that Thomas learned about the incident after Clark left but while he was still employed at iStar. (*See* Thomas Aff. at 29–30, Deposition Transcript of Jama Clark at 44.)

Nonetheless, the Court concludes that, with nothing more than these isolated events, a reasonable trier of fact could not conclude that a hostile work environment existed on the basis of the facts alleged. Even if all the incidents Thomas alleges actually occurred, the conditions Thomas complains about were not sufficiently pervasive, severe or threatening to violate Title VII. The United States Supreme Court has held that occasional off-color or inappropriate remarks with racial or sexual undertones do not alone create a hostile work environment under Title VII. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271–72, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). Although reasonable persons could find many of Baron and Agarwal's alleged racial comments offensive, the remarks were occasional and isolated. The record does not support a reasonable finding that the comments occurred in the "continuous and concerted" manner sufficient to constitute a hostile work environment. *See Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir.2000)(*quoting Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000)); *see also Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997)(stating that the alleged incidents must be more than "episodic") (citations omitted).

Moreover, as Shanks observed, a number of Baron's alleged comments appear to reflect more an aggressive management style than racial animus. As the Supreme Court has noted, Title VII is not intended as a "general civility code." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Accordingly, employee conduct founded on "the ordinary tribulations of the workplace, such as the use of abusive language"

by itself is not actionable under Title VII. *Dawson,* 246 F.Supp.2d at 329 (*quoting Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

## C. *RETALIATION*

Until recently, a prima facie case under the anti-retaliation provision of Title VII required a showing by plaintiff that (1) he participated in a protected activity, (2) his employer was aware of that participation, (3) he suffered an adverse *employment* action, and (4) a causal connection existed between the protected activity and the adverse employment action. *See Gonzalez v. City of New York,* 354 F.Supp.2d 327, 340 (S.D.N.Y.2005) (*citing Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998)). However, the United States Supreme Court recently ruled that retaliation claims need not be limited to adverse *employment* actions. *See Burlington Northern and Santa Fe Railway Co. v. White,* —— U.S. ——, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Specifically, the Court held that Title VII's anti-retaliation and anti-discrimination provisions should not be construed to be coextensive: while Title VII's anti-discrimination provision prohibits specific employment actions, the anti-retaliation provision does not "confine the actions and harms it forbids to those that are related to employment or occur at the workplace." [5] *Id.* at 2409. That said, to be actionable, a retaliatory action must be "materially adverse," which the Supreme Court defined as an action that might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2410–11 (internal quotations omitted). The anti-retaliation provision

does not protect employees from "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* The determination of whether an action is materially adverse depends largely on the context in which it occurs (*e.g.,* a work scheduling change could significantly impact a mother with young children but not other employees). *Id.* at 2411.

 In sum, to establish a prima facie case under the new reading of Title VII's anti-retaliation provision, Thomas must show: participation in a protected activity, knowledge by his employer of such activity, that he suffered a materially adverse action, and that there is a casual connection between the protected activity and the materially adverse action.

 In terms of participation in a protected activity, Thomas argues that he was retaliated against for informal complaints he made to his managers about his treatment by Baron and Agarwal. Informal complaints to supervisors can be considered protected activity under Title VII. *See Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 65 (2d Cir.1992). This employee privilege to report and protest workplace discrimination exists both when discrimination actually occurs and when it is reasonably perceived. *See* 42 U.S.C. § 2000e–3(a); *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir. 1996) (*quoting Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)); *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990).

---

5. The Supreme Court provided several examples of retaliation unrelated to employment or occurring outside of the workplace that would be actionable under Title VII: the Federal Bureau of Investigation's agents refusing to investigate death threats against an employee, and an employer filing false criminal charges against an employee. *Id.* at *7 (internal citations omitted).

As to the second requirement, employer knowledge, the employer must have "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998). In other words, Thomas's complaints needed to make clear that he was opposing activity made illegal by Title VII.

On the basis of these first two criteria, not all of Thomas's complaints can form the basis for a retaliation claim. As described, many of Thomas's complaints centered on general allegations of harassment unrelated to race—these complaints are not protected activity under Title VII. (*See* Section II.C above.) A few of Thomas's complaints would, however, have alerted iStar that he was complaining about conduct potentially encompassed by Title VII, and thus satisfy the first two requirements of a prima facie case. These include his complaints to Barker and Shanks that Baron's comments that "he was raised in the streets" like Thomas were racially stereotyping, belittling, and false; his August 2001 complaint to Dugan that Baron allegedly referred to Thomas's daughter as a "little black dot"; and his August 2002 complaint to Barker and Shanks that Agarwal allegedly called him a "nigger."

Thomas must also demonstrate that he suffered a materially adverse change that, from an objective perspective, might have dissuaded a reasonable worker from making the complaints, and that a causal connection existed between his protected activity and the materially adverse action. Thomas alleges that Defendants took adverse action against him by continuing a hostile work environment, reprimanding him, threatening him, giving him negative employment references or not giving him positive references, and terminating him.

Only Thomas's retaliatory termination claim survives summary judgment.

A retaliatory hostile work environment has been considered actionable when incidents of harassment following complaints were sufficiently continuous and concerted to have altered conditions of an employee's employment. *See, e.g., Richardson*, 180 F.3d at 446. A hostile work environment could also constitute a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII. As discussed above, however, the incidents Thomas complained of were insufficient to constitute a hostile work environment. Moreover, these incidents gave rise to Thomas's alleged informal complaints, rather than being the result of the complaints. Thomas's general allegation that "it got worse" after his complaints were made is too vague to sustain a hostile work environment retaliation claim. (Thomas Aff. at 35.)

Giving negative references or refusing to give positive references in retaliation for a protected activity has also been considered retaliation in violation of Title VII. *See e.g., Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166 (2d Cir.2005); *Pantchenko v. C.B. Dolge Co.*, 581 F.2d 1052, 1054 (2d Cir.1978). Although iStar denies ever giving a negative employment reference, Thomas presented evidence that when a recruiter contacted iStar in September 2003, iStar employees discussed only the bare minimum of information about Thomas's employment. (*See* Email from Dugan to Shanks, dated Sept. 23, 2003, attached as Exhibit 117 of Pl. Mem.)

Nonetheless, Thomas's claim based on negative or non-positive references does not survive summary judgment because it fails to establish a causal connection between his informal com-

plaints and the negative or non-positive references. A close temporal relationship between the protected activity and the adverse action would suffice to establish causation if the timing were extremely proximate. *See Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001); *Manoharan v. Columbia University College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). Here, however, Thomas's last informal complaint for which he specifies a date occurred in August 2002, more than a year before iStar employees allegedly gave negative references to a recruiter. In the absence of any other causal evidence, the temporal relationship between the two events is too remote to sustain a retaliation action.

■■■ Thomas also alleges retaliation in the form of reprimands. A reprimand may be considered an adverse employment action, and likewise could constitute a materially adverse action, depending on the context and the severity of the reprimand. *See Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) ("Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."). Thomas describes two situations in which he was allegedly reprimanded: (1) after Thomas complained to Tretola and Barker about Baron falsely accusing him of sexual harassment, Baron allegedly told Thomas that he should not have complained about the incident; (2) after the August 2003 incident concerning Zoeckler's project, Baron allegedly gave Tretola false information about Thomas's conduct which resulted in her giving Thomas a formal verbal warning.[6] The Court is not persuaded that either of these reprimands constitute a materially adverse action. But even if they did, Thomas has once again failed to show a causal connection between his actionable

informal complaints and the reprimands. While the first reprimand followed an informal complaint, the complaint was not a protected activity because Thomas did not complain that the sexual harassment allegation was the result of racial bias. The second reprimand occurred almost a year after the last informal complaint for which Thomas specified a date, which again is too remote to establish a causal connection based on timing alone.

■■■ Threats could also potentially be a materially adverse action. *See Brown v. Henderson,* 115 F.Supp.2d 445, 451 (S.D.N.Y.2000). Thomas describes three instances in which he was allegedly threatened following a complaint: Baron telling Carlson he would "get rid of" of Thomas because he was "creating problems," Baron telling an assistant he would "get rid of" Thomas, and Agarwal telling Thomas he was on the "five-year plan." (*See* Thomas Aff. at 36–37.) Only the second and third alleged threats directly followed Thomas's actionable informal complaints, but are grounded on hearsay comments made to third parties, not to Thomas directly. Even if all three comments were made in retaliation for Thomas's actionable complaints, the Court is not persuaded that these threats constitute materially adverse action sufficient to sustain a retaliation claim. Only Agarwal's "threat" was made directly to Thomas and it did not necessarily have a clear implication.

■■■ Thomas's final retaliation claim is based on termination. Termination is clearly a materially adverse action that would dissuade a reasonable worker from making a complaint. Thomas asserts that persons involved in the termination decision—Baron, Agarwal, and possibly Dugan—were fully aware that Thomas had

---

6. Thomas disputes that a formal warning was given. (*See* Thomas Aff. at 43.)

complained about his allegedly discriminatory treatment as described above and were motivated to recommend his termination in retaliation.

 Thomas has submitted sufficient evidence of a causal connection between his informal complaints and his termination to establish a prima facie case for retaliatory termination. Specifically, Thomas alleges that following his August 2001 complaint to Dugan, he heard Baron tell an administrative assistant that he would "get rid of" Thomas and that following his August 2002 complaint to Barker and Shanks, Agarwal told Thomas he was on the "five-year plan." (*See* Thomas Aff. at 36–37.)

Title VII retaliation claims operate under the *McDonnell Douglas* burden-shifting standard described above. If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to provide a non-discriminatory reason for the adverse employment action. If the defendant succeeds, the burden shifts back to the plaintiff to demonstrate that a retaliatory motive nonetheless played a part in the adverse action, "whether or not it was the sole cause." *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993).

Defendants have also met their burden of proffering non-retaliatory reasons for the termination, namely, Thomas's alleged poor work performance. As with the discriminatory termination claim discussed above, however, Thomas's evidence that his performance was sufficient enough to earn raises, bonuses, a solid performance review, and a promotion raises a genuine

issue of material fact as to whether retaliation in fact motivated his termination.

### D. DISPARATE PAY AND TREATMENT

 As noted in Section IV.A above, Thomas alleges disparate treatment—specifically, in pay, discipline, and training—in support of his argument that discrimination motivated his termination. It is unclear from Plaintiff's Complaint and Plaintiff's Memorandum if he intended disparate treatment to be a separate Title VII claim as well. For the reasons described below, however, such claims would not survive summary judgment.

 To establish a prima facie case of disparate pay under Title VII, a plaintiff must show: "(1) that he was a member of a protected class; (2) that he was paid less than similarly situated non-members of his protected class; and (3) evidence of discriminatory animus." *Quarless v. Bronx–Lebanon Hosp. Ctr.,* 228 F.Supp.2d 377, 383 (S.D.N.Y.2002), *aff'd* 75 Fed. Appx. 846 (2d Cir.2003) (*citing Belfi v. Prendergast,* 191 F.3d 129, 140 (2d Cir.1999)).

 Although it is undisputed that Thomas is a member of a protected class, he has presented no evidence showing that he was paid less than similarly situated employees who are not in his protected class.[7] Thomas points to five non-black manager level employees who were earning higher salaries than he was in 2003. Thomas's 2003 base salary plus prior year bonus ("combined compensation") totaled $64,500. He joined iStar in 2000, allegedly

---

**7.** To be "similarly situated," the individuals to whom Thomas compares himself must be similarly situated in "all material respects." *Shumway v. UPS,* 118 F.3d 60, 64 (2d Cir. 1997). They must share "a sufficient amount of significant employment characteristics," including similar educational backgrounds, seniority, performance, and work duties. *De-Jesus v. Starr Tech. Risks Agency, Inc.,* No. 03 Civ. 1298, 2004 WL 2181403 at *9 (S.D.N.Y. Sept. 27, 2004); *see also Quarless,* 228 F.Supp.2d at 384.

with three years of college experience.[8] Payroll Specialist Gerri Geniblazo's combined compensation was $70,350. She also joined the company in 2000 and does not have a college degree. Events Manager Liz Sanzo's combined compensation was $120,000. She joined iStar in 1998 and holds a three-year associates degree. Office Manager Diane Maffatore's combined compensation was $75,000. She joined iStar in 1998 and holds an associate's degree. Treasury Analyst Kathy Lee's combined compensation was $75,225. She joined iStar in 2000 and holds a college degree. Finally, Thomas's replacement, Carlson, earned a base salary of $45,000 when she took over the Accounts Payable Manager position, as compared to Thomas's base salary of $44,500. She joined iStar in 2000 and holds a college degree.

With the exception of his replacement, Carlson, none of the employees to whom Thomas seeks to compare himself are similarly situated in terms of their duties or responsibilities. Although many share the title of "manager," the employees work in fields within iStar different from Thomas's and have different duties and responsibilities. Further, Carlson cannot be considered "similarly situated" because even though she succeeded Thomas in the same position, she holds a college degree, while Thomas does not. See Bitter v. Chase Manhattan Bank, No. 80 Civ. 6810, 1983 WL 610 (S.D.N.Y. Dec.7, 1983) (holding that higher-paid white employees to whom black plaintiff compared himself were not similarly situated because they had college degrees, while plaintiff held a high school diploma).

The Court is also not persuaded by Thomas's allegations of disparate discipline and training. Although Thomas speculates that he would have been subject to disciplinary action harsher than that which his white colleague Carlson received for similar errors, he submits no evidence of actual situations in which he was subjected to more severe penalties. Further, Thomas's allegation that iStar immediately sent Carlson to training while delaying his training request does not constitute persuasive evidence that the training opportunities he and Carlson received were disparate, since it is undisputed that Thomas also initially received training when he began working at iStar. (See Deposition Transcript of Kenneth J. Thomas at 57–58, 60.) Accordingly, Thomas has failed to present sufficient evidence to raise a genuine issue of material fact as regards his disparate pay and treatment claims.

## V. ORDER

For the reasons set forth above, it is hereby

ORDERED that the motion of defendants iStar Financial, Inc. and Ed Baron (collectively, "Defendants") for summary judgment dismissing the complaint of plaintiff Kenneth Thomas ("Thomas") pursuant to Federal Rule of Civil Procedure 56(c) is GRANTED with respect to Thomas's claims of hostile work environment; retaliation in the form of continuing a hostile work environment, threatening, reprimanding, giving negative or non-positive references; and disparate treatment; and it is further

---

**8.** Defendants dispute the length, source, and completion status of Thomas's college education and cite discrepancies among Thomas's various resumes and statements to recruiters and in depositions. (See Advice Personnel Form, dated Sept. 2, 2003; Thomas resumes, undated; Fax from Robin Gargiulo, dated Jul. 17, 1999; Fax from Nixa Rosado, dated Jun. 18, 1999; Application for Employment, dated June 25, 1992, attached as Exhibits B–K in Further Support of Def. Motion.)

**ORDERED** that Defendants' motion with respect to Thomas's claim for wrongful termination and retaliation in the form of termination is DENIED; and it is finally

**ORDERED** that the parties appear at a conference with the Court on July 27, 2006 at 4:45 p.m. to discuss trial preparations and scheduling, as well as the prospects for settlement of this action.

**SO ORDERED.**