Robin **GAFFNEY**, et al., Plaintiffs,

v.

**DEPARTMENT OF INFORMATION TECHNOLOGY AND TELECOMMUNICATIONS** et al., Defendants.

No. 04 Civ. 10179.

United States District Court,
S.D. New York.

March 5, 2008.

450

Eugenie Gilmore, Law Offices of Eugenie Gilmore, New York, NY, for Plaintiffs.

Amy Grossberg, Blanche Jayne Greenfield, New York City Law Department, New York, NY, for Defendants.

### DECISION & ORDER

### VICTOR MARRERO, District Judge.

Plaintiffs Robin Gaffney ("Gaffney"), Polycarpe Kalembwe ("Kalembwe"), and Albert Stewart ("Stewart") (collectively, "Plaintiffs") brought this action against the New York City Department of Information Technology and Telecommunications ("DOITT"); NYC–TV, which was formerly known as Crosswalks Television ("Crosswalks"); the City of New York ("City"); Arick Wierson ("Wierson"); Yocasta Delgado ("Delgado"); Walter Garaicoa ("Garaicoa"); Michael McKenna ("McKenna"); and Seth Unger ("Unger") (collectively, the "Defendants"). Plaintiffs allege discrimination in employment on the bases of age, race, color, gender, and disability under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA"); the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 (" § 1981") and 1983 (" § 1983"); and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"). Plaintiffs also bring supplementary State and City discrimination claims based on discrimination and retaliation in the terms, conditions, and privileges of employment, as protected under the New York State Human Rights Law, Executive Law § 290

*et seq.* ("NYSHR") and the Administrative Code of the City of New York § 8–101 *et seq.* ("NYCAC") (collectively, the "Local Laws").

Defendants move for summary judgment pursuant to Federal Rules of Civil Procedure 56 ("Rule 56") on the grounds that Plaintiffs cannot establish a *prima facie* case of discrimination or retaliation and that Plaintiffs cannot show that the legitimate nondiscriminatory, nonretaliatory business reasons for Defendants' actions were false and a pretext for discrimination. For the reasons stated below, Defendants' motion is DENIED in part and GRANTED in part.

### I. BACKGROUND [1]

### A. DEFENDANTS

Crosswalks was a group of cable channels set aside by the City for educational and governmental use. Crosswalks was supervised by the City and operated and administered by DoITT, a municipal agency of the City. The Research Foundation of the City University of New York ("Foundation"), pursuant to a Memorandum of Understanding ("MOU") with DoITT, also had limited administrative responsibilities for Crosswalks. Under the MOU, Foundation was a contractor that provided services to the City, and the individuals employed pursuant to the MOU ("Foundation Line Employees") were paid on the Foundation budget line ("Foundation Line"), and they were technically not

---

**1.** The factual summary presented herein derives primarily from the following documents: the Complaint, dated December 23, 2004 ("Complaint"); Answer, dated April 28, 2005; Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated July 13, 2007; Plaintiffs' Memorandum of Law in Opposition to Defendants' Rule 56 Summary Judgment Motion, dated August 30, 2007; Reply Memorandum of Law in Further

Support of Defendants' Motion for Summary Judgment, dated October 5, 2007; Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated July 13, 2007 ("Defts.' 56.1"); Plaintiffs' Counter–Statement Local Civil Rule 56.1 Statement of Undisputed Facts, dated August 30, 2007 ("Pls.' 56.1"). Except where specifically-referenced, no further citation to these sources will be made.

City employees. Foundation Line Employees signed Personnel Action Forms each year, which stated that their "employment [was] subject to [the] availability of funds," that their employment's length was "not fixed for any period," and that the Foundation had discretion over "promotions, salary increases or terminations." (Defts.' 56.1 ¶ 4.) Due to a municipal fiscal crisis in 2002 and 2003, the City required DoITT to make budget cuts totaling $500,000 in savings. In early 2003, DoITT laid off employees in Crosswalks' production unit ("Production Unit") as part of a reduction in force. On June 6, 2003, DoITT discontinued the MOU, terminating all Foundation Line Employees, and used the resulting savings in administrative costs to fund seventeen new Crosswalks positions at DoITT.

At all relevant times, Wierson was the General Manager of Crosswalks; Delgado was the Director of Administration at Crosswalks for Foundation Line Employees; McKenna was the Senior Operations Manager of Crosswalks; Unger was the Director of Programming; and Garaicoa was the Senior Editor at Crosswalks.

## B. *PLAINTIFFS*

### 1. *Gaffney*

On November 29, 1999, Gaffney, a black female, was hired by DoITT to work for Crosswalks as a provisional producer, for which she was paid an hourly wage on the DoITT budget line ("DoITT Line"), not the Foundation Line. Gaffney was never promoted to a higher civil service title or position, and she never received a merit raise. On May 2, 2003, McKenna met with Gaffney, advising her that, due to fiscal reasons, DoITT was laying off her and seven other Production Unit employees (collectively, the "Layoffs"). The Layoffs were comprised of four white, two Hispanic, and two black individuals, with six being males and two females. DoITT retained three producers from the Production Unit, namely: Adele Merlino ("Merlino"), a white female; Robert Kalm, a male ("Kalm"); and Harry Hunkele, a male ("Hunkele") (it is unclear from the record as to Kalm and Hunkele's racial classification). At the time of Gaffney's termination, three white free lance producers (one male and two females) performed work for Defendants. Gaffney requested that she be allowed to work as a freelancer, but Defendants refused. At the time of Gaffney's termination, there were no black full-time or senior producers at DoITT.

Within two months after Gaffney was terminated, Defendants posted three Production Unit openings at DoITT, namely two Segment Coordinator positions and a Content Coordinator position (collectively, the "Coordinator Positions"). The Coordinator Positions had similar duties to Crosswalks' traditional producer positions and the Coordinator Positions started at higher salary levels than Gaffney's pre-termination salary. Gaffney did not apply for any of the open Coordinator Positions, and Defendants did not offer either position to Gaffney. According to Defendants, the Segment Coordinator positions were filled by Emily Post, a white female, and Steven Butler–Aleyande ("Butler–Aleyande"), a black male who was 38 years old at the time of the reorganization. Gaffney disputes that Butler–Aleyande actually filled the Segment Coordinator position, asserting that he held the position in title only while continuing to perform his previous function of Nighttime Producer. The Content Coordinator position was filled by Elizabeth Gerst, a white female.

### 2. *Kalembwe*

In 1992, Kalembwe, a black male who was 53 years-old and who suffered from

diabetes mellitus at the time of his termination, began working as Crosswalks' MIS Network Support Manager. Kalembwe was a Foundation Line Employee.

On August 31, 1998, Kalembwe and a group of co-workers, including Stewart, commenced litigation in the Southern District of New York, Docket Number 98 Civ. 7316(BSJ) ("1998 Case"), against Crosswalks, alleging unlawful discrimination. Kalembwe, as part of the case, claimed that Crosswalks discriminated against him on the bases of race and national origin. The 1998 Case was dismissed by an order dated February 21, 2002.

Kalembwe signed a Personnel Action Form for the fiscal year July 1, 2002 through June 30, 2003. During a March 26, 2003 meeting with DoITT's management ("Termination Meeting"), Kalembwe and other Foundation Line Employees were notified that the MOU would be discontinued on June 6, 2003 and that all Foundation Line Employees would be terminated. Those present at the Termination Meeting, which included Stewart and Kalembwe, were informed that a number of positions were available at DoITT, and Defendants invited all Foundation Line Employees to apply for the open positions.

On March 27, 2003, Kalembwe applied for the Broadcast MIS Administrator position ("MIS Position") at DoITT. He did not apply for any other available positions. Kalembwe, and three white individuals who were all under forty years of age, interviewed for the MIS Position. DoITT decided not to hire anyone to fill the MIS Position, choosing instead to outsource the position and centralize all MIS staff outside of Crosswalks. Defendants rescinded the MIS Position vacancy posting.

Kalembwe's diabetes affected him at work by causing him to fall asleep for five to ten minutes on rare occasions (roughly once every nine to eleven months) and other effects such as feeling woozy and fatigued. Kalembwe informed McKenna and his other supervisors of his diabetic condition and its potential effects. As an accommodation, Kalembwe requested that McKenna be patient and understanding if he fell asleep at work. Kalembwe stated that McKenna was understanding and met this accommodation.

### 3. *Stewart*

In 1993, Stewart, a black male who was 43 years-old at the time of his termination, began working at Crosswalks as a Transmission Operator and was a Foundation Line Employee. During his time at Crosswalks, Stewart held various positions, including Director, Assistant Director, Studio Coordinator, Cameraman, Crew Chief, and Master Control Operator ("MCO"), which was the position Stewart held at Crosswalks when he was terminated.

In 1997, Stewart filed a racial discrimination and retaliation complaint in the Southern District of New York, Docket Number 97 Civ. 9268 ("1997 Case"), against Crosswalks, DoITT, and the City (collectively, the "1997 Defendants"). In 2000, the City moved for summary judgment, and Stewart's opposition included an affidavit provided by Kalembwe. The 1997 Case was scheduled for trial in 2002, and Kalembwe's name was included on Stewart's witness list, which was submitted to the 1997 Defendants' attorneys. The 1997 Case settled in August 2002 and did not proceed to trial.

Stewart signed a Personnel Action Form for the fiscal year July 1, 2002 through June 30, 2003. Defendants informed Stewart at the Termination Meeting that his employment was being terminated, and they invited him to apply for positions at

DoITT. Stewart applied for four different positions with DoITT, namely: Electronic News Gathering Supervisor ("ENG Supervisor"), MCO, Nighttime Producer, and Camera Operator.

### a. Camera Operator

On April 30, 2003, McKenna interviewed six applicants ("Applicants"), including Stewart, for the Camera Operator position. Stewart, unlike many of the other Applicants, did not bring a sample reel of his camera work to the interview, limiting his ability to discuss certain aspects at the interview. The position posting, however, did not state that the Applicants must bring a sample reel to the interview. DoITT selected two Applicants for the position, Wiener Milien ("Milien"), who is black, and Freddy Luna ("Luna"), who is Hispanic.

Months before Stewart interviewed for the Camera Operator position, McKenna had offered Stewart an opportunity to work in the ENG department a few days a week in order to gain experience with contemporary camera technology, but Stewart declined the opportunity. Additionally, six to nine months prior to the Camera Operator interview, McKenna offered Stewart at least one opportunity to perform camera work, but Stewart declined it.

### b. MCO

McKenna asserts that, on April 30, 2003, he interviewed Stewart for the MCO position. MCOs work in broadcast facilities, airing and monitoring programs. DoITT selected four individuals for the MCO position, one of whom was a black male over 40. Stewart claims that he was not interviewed for the MCO position.

### c. Nighttime Producer

Although Stewart applied for the Nighttime Producer position, he was not inter-viewed for it. Stewart asserts that DoITT offered this position to Butler–Aleyande. Defendants claim that the Nighttime Producer position opening was withdrawn and not filled.

### d. ENG Supervisor

Although Stewart applied for the ENG Supervisor position, he was not interviewed for it. Steven Vigilante ("Vigilante"), a white male, was selected for this position.

## C. PLAINTIFFS' CLAIMS

### 1. Procedural Prerequisites

Plaintiffs filed a charge of discrimination against DoITT, Crosswalks, and the City with the Equal Employment Opportunity Commission ("EEOC") and requested a Right to Sue letter. On September 29, 2004, the EEOC issued a notice informing Stewart and Kalembwe of their right to sue Defendants in federal court with respect to the ADEA claims. They received the notice on October 15, 2004.

On November 8, 2004, the United States Department of Justice ("DoJ") issued a notice informing Plaintiffs, as a whole, of their right to sue Defendants in federal court with respect to their Title VII claims, and Kalembwe individually, with respect to his right to sue on his ADA claim. Plaintiffs contend, and Defendants do not dispute, that they have timely met all procedural prerequisites for bringing their employment discrimination claims.

### 2. The Complaint

Plaintiffs filed the Complaint with this Court on December 23, 2004, claiming that Defendants unlawfully discriminated against them in the terms and conditions of their employment. More specifically, in the Complaint Gaffney claims that by Defendants terminating her employment,

they discriminated against her in the terms and conditions of her employment on the bases of her race and gender, in violation of Title VII, NYSHR, and NYCAC. Stewart and Kalembwe claim that Defendants have intentionally discriminated against them in the terms and conditions of employment on the bases of race and age, in violation of Title VII, ADEA, NYSHR, and NYCAC. Stewart and Kalembwe also claim that Defendants violated Title VII, NYSHR, and NYCAC by retaliating against them for complaining, participating in a protected activity, or opposing discrimination. Individually, Kalembwe claims that Defendants intentionally discriminated against him in the terms and conditions of his employment based upon disability in violation of the ADA, NYSHR, and NYCAC. Finally, Plaintiffs claim that the City is liable for civil rights violations pursuant to §§ 1981 and 1983.

## II. *LEGAL STANDARD*

Under Second Circuit case law, "the salutary purposes of summary judgement—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988) (citation and quotation marks omitted). The Court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court ascertains which facts are material by considering the substantive law of the action, for only those "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if a dispute of

the material facts exists, summary judgment will be granted unless the dispute is "genuine," meaning that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505.

The initial burden rests with the moving party to demonstrate the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the non-moving party must provide "specific facts showing a genuine issue for trial" in order to survive the motion for summary judgment. Fed.R.Civ.P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," even where the material fact at issue is an employer's intent and motivation, but "where such is the issue, summary judgment should be used sparingly." *Dister,* 859 F.2d at 1114 (citation and quotation marks omitted).

In considering a motion for summary judgment, the Court must view the evidence in a light that is favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004). However, the Court must refrain from weighing the evidence and restrict its inquiry to whether there are triable issues of material fact. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

## III. *DISCUSSION*

### A. *ANALYTICAL FRAMEWORK FOR SUMMARY JUDGMENT IN DISCRIMINATION CASES*

Under Title VII, it is unlawful "for an employer ... to fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *St. Mary's Honor Ctr.,* 509 U.S. at 513, 113 S.Ct. 2742 (citation and quotation marks omitted). Under the ADEA, it is unlawful for an employer "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

██ "In cases, as in the one at hand, where the evidence of the alleged wrongdoing is circumstantial rather than direct, courts analyze employment discrimination claims pursuant to Title VII and the ADEA under the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Ascione v. Pfizer, Inc.,* 312 F.Supp.2d 572, 576 (S.D.N.Y. 2004) (*citing Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). A plaintiff asserting employment discrimination must first establish a *prima facie* case of discrimination by showing that: (1) she was within a protected group; (2) she was qualified for and satisfactorily performed the functions of her position; (3) she suffered an adverse employment action; and (4) the action took place in circumstances giving rise to an inference of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir.2005). Examples of how a plaintiff could show that the circumstances support an inference of discrimination include but are not limited to: employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; the sequence of events leading to the alleged discriminatory event; more favorable treatment of others outside the protected group; degrading comments made in criticisms of a plaintiff's job performance; and invidious comments regarding others in plaintiff's protected group. *See Chambers v. TRM Copy Ctr. Corp.,* 43 F.3d 29, 37 (2d Cir. 1994) (citations and quotation marks omitted). "Generally speaking, a plaintiff's burden of establishing a prima facie case in the context of employment discrimination law is minimal." *Collins v. New York City Transit Auth.,* 305 F.3d 113, 118 (2d Cir.2002) (citation and quotation marks omitted).

If the plaintiff establishes a *prima facie* case, the burden of production, but not persuasion, shifts to the employer, requiring the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the defendant meets this intermediary burden, then the burden returns to the plaintiff to show by a preponderance of the evidence that the proffered legitimate reason "[was] not [the defendant's] true reason, but [was] a pretext for discrimination." *Woodman,* 411 F.3d at 76; *see also Quaratino v. Tiffany & Co.,* 71 F.3d 58 (2d Cir.1995) ("An employer's reason for [the adverse employment action] cannot be proven to be a pretext for discrimination unless it is shown to be false *and* that discrimination was the real reason.") (*citing St. Mary's Honor Ctr.,* 509 U.S. at 515–16, 113 S.Ct. 2742) (emphasis in original). The employer will be entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James,* 233 F.3d at 154 (*citing St. Mary's Honor Ctr.,* 509 U.S. at 510–11, 113 S.Ct. 2742) (additional citations omitted).

Defendants assert that summary judgment on the Plaintiffs' discrimination claims is warranted because Plaintiffs can establish neither a *prima facie* case nor demonstrate that Defendants' legitimate, nondiscriminatory reasons were pretextual.[2]

### 1. *Gaffney*

#### a. *Gaffney's Claim of Unlawful Discriminatory Termination on the Basis of Race*

Defendants assert that Gaffney cannot establish a *prima facie* case or that their proffered nondiscriminatory reason for terminating her employment was pretext for racial discrimination. The Court disagrees.

■ Gaffney has established a *prima facie* case for race discrimination on the basis of her termination. Defendants do not dispute that: Gaffney is within a protected group; that she was qualified for and satisfactorily performed the functions of her position;[3] and that she suffered an adverse employment action. Instead, Defendants assert that Gaffney cannot establish that the circumstances surrounding termination can be construed to raise a reasonable inference of discrimination. Gaffney counters that Defendants, who purportedly terminated her employment as part of a reduction in force, began hiring additional employees into the Production Unit to perform the same or similar duties shortly after her termination. Further, Gaffney asserts that no white employees at DoITT were terminated as a result of Defendants' reduction in force.

The Court concludes that Gaffney has met her minimal burden of establishing that a rational juror could conclude that the circumstances surrounding her termination gives rise to a reasonable inference of racial discrimination. Accordingly, Gaffney has established a *prima facie* case.

■ Defendants submit that their nondiscriminatory reason for terminating Gaffney was a legitimate reduction in force prompted by budget cutbacks mandated by the City. Defendants assert that Gaffney was a provisional employee, and that pursuant to the New York Civil Service Laws, provisional employees must be terminated before permanent civil servants in their title and unit may be terminated. *See* N.Y. Civ. Serv. Law § 80 (1999).

■ Even during a legitimate workforce reduction, however, an employer may not dismiss employees for unlawful discriminatory reasons. *See Hagelthorn v. Kennecott Corp.*, 710 F.2d 76 (2d Cir.1983). Discrimination cases can center on whether the selection of the employees to be fired in a downsizing was influenced by an impermissible ground. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56–57 (2d Cir.1998) ("The fact that there was an overwhelming reduction in [employer's] workforce certainly is a factor that the jury may consider when weighing whether to credit [employee's] or [employer's] versions of the events, ... [b]ut that fact alone ... cannot provide the ground for summary judgment."). Where most of the employee's duties were not eliminated, but transferred to others, the triable question arises of whether the employer's decision

---

**2.** Plaintiffs also bring their discrimination claims under the Local Laws. Courts apply the same burden-shifting analysis to these claims as the federal claims. *See Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001) (ADEA); *Cruz v. Coach Stores,*

*Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000) (Title VII).

**3.** Though Defendants assert that Gaffney was less skilled than the producers who were retained, they have not asserted that her performance was generally unsatisfactory.

was really a choice of which person to lay off, not which position to eliminate. *See Burger v. New York Inst. of Tech.*, 94 F.3d 830, 832–34 (2d Cir.1996). Whether particular terminations and hires were done in accordance with a legitimate, lawful intent to reorganize or whether terminations were in part to make way for people in a favored classification, or rid the organization of the disfavored classification, is a question of fact for the jury. *See David v. Comtech PST Corp.*, No. 03 Civ. 6480, 2006 WL 2713936, at *13 (E.D.N.Y. Sept. 22, 2006).

Gaffney asserts that Defendants' proffered nondiscriminatory reason was false because Defendants did not reduce the Production Unit's overall salary expenditures, and it was a pretext for racial discrimination because Defendants merely moved Gaffney's responsibilities to two white female producers. Although Gaffney concedes that under New York Civil Service Law § 80 provisional employees must be terminated before permanent civil servants in their title and unit may be terminated, she counters that not all of the provisional employees in the Production Unit were terminated. Gaffney further asserts that shortly after she was terminated, DoITT posted vacancies for the Coordinator Positions. Gaffney claims, and Defendants dispute, that these Coordinator Positions functionally assumed either the same or similar responsibilities that she held prior to termination, and that Defendants filled these positions with two white females.[4] Whether the Coordinator Positions were functionally new, separate, and independent positions with additional duties and responsibilities, as Defendants contend, rather than merely producer positions, which functionally included the same or similar responsibilities as the position Gaffney held prior to termination, as she contends, is an issue of material fact.

Further, Gaffney asserts that, though Defendants proffer that her employment was terminated in accordance with budgetary cutbacks, there is a question of fact whether Defendants actually reduced the total amount of salaries in the Production Unit. Gaffney claims DoITT hired additional outside people into the Production Unit, paying them higher salaries subsequent to the terminations, and that shortly following her termination, Defendants hired new producers, whose combined salaries were greater than those of the terminated producers. For example, at the time of Gaffney's termination, her salary was $31,936, but the salary of the Content Coordinator position was $57,187. Gaffney also asserts that, shortly after her termination, Defendants gave promotions and raises to some decision makers, which further increased Defendants' overall salary expenditures. Further, Gaffney asserts that a list of the proposed Crosswalks employees to be laid off was submitted to Gino Menchini ("Menchini"), DoITT's Commissioner, and that afterwards, Merlino, the white female on the list who commanded a salary nearly $20,000 more than Gaffney, was removed from the list and not laid off.

The Court, drawing all reasonable inferences in favor of Gaffney, concludes that Gaffney has demonstrated sufficient evidence from which a reasonable jury may conclude that Defendants' proffered non-

---

**4.** Defendants allege that the Coordinator Positions were filled by two white females and Butler–Aleyande, a black male. Gaffney counters that while Defendants may have given Butler–Aleyande the title of Segment Coordinator, he continued to performing his old function of Nighttime Producer and did not functionally assume the Segment Producer responsibilities. According to Gaffney, this would leave only the two white females as assuming the same or similar responsibilities that Gaffney had prior to termination.

discriminatory motive for the layoffs was false and a pretext for discrimination.

b. *Gaffney's Claim of Discriminatory Termination on the Basis of Gender*

Gaffney claims that she and Merlino, a female producer who was one of the three producers retained from the Production Unit, were treated worse than their male coworkers, and that Gaffney was terminated, at least in part, on the basis of gender.

■ As evidence supporting her gender discrimination claim, Gaffney points to two statements she claims were made by Defendants' supervisors. Gaffney asserts that she and Merlino were removed as on air announcers, and that they expressed their displeasure to Unger, Crosswalks' Director of Programming, who is male. Upon hearing Gaffney and Merlino's complaints, Unger reportedly told Gaffney, "it is like this, we went from the basement and now we want to go to the penthouse" ("Unger's Comment"). (Aff. of Robin Gaffney, attached as Ex. 14, ¶ 26 to Pls.' 56.1.) Additionally, after Merlino and Gaffney were involved in an automobile accident while driving a Crosswalks van, Martin Starkey, Crosswalks' Production Manager, referred to them as "[those] two women" when advising Wierson and Unger of the accident ("Starkey's Comment"). *Id.*

The Court is not persuaded that the proffered comments sufficiently raise an inference of gender discrimination. Assuming Unger's Comment was made, it does not expressly or implicitly criticize Gaffney on the basis of her gender and thus, a reasonable juror could not infer gender discrimination from Unger's Comment. While Starkey's Comment could reasonably be interpreted as using gender to belittle Gaffney and Merlino, "it is well settled that stray remarks, with no nexus to the alleged adverse employment action,

do not, without more, establish gender discrimination." *Ramos v. Marriott Int'l, Inc.,* 134 F.Supp.2d 328, 338–39 (S.D.N.Y. 2001) (finding that, within context, statements such as "if you wanted to do a man's job, you better make sure you have what it takes in your pants to do it" and "never send a woman to do a man's job" are sufficient to create an inference of discrimination and establish that plaintiff was treated less favorably than similarly situated male employees) (citations omitted).

Starkey's Comment was sent to Wierson and Unger via email on October 15, 2002, nearly seven months prior to Gaffney's termination in May of 2003, and nowhere within Starkey's Comment or the resulting email chain does Starkey or Wierson suggest that Gaffney or Merlino should be terminated or otherwise reprimanded. Further, Merlino, who was also included in Starkey's Comment, was retained as a producer in the Production Unit by Defendants. After considering the evidence produced in a light most favorable to Gaffney, the Court is not persuaded that Gaffney has established a reasonable potential nexus between Starkey's Comment and her termination. Accordingly, Gaffney has not met her burden of establishing that her termination occurred under circumstances raising a reasonable inference of gender discrimination.

c. *Gaffney's Claim that Defendants Unlawfully Failed to Hire Her as a Content or Segment Coordinator on the Basis of Race or Gender*

■ Defendants assert that Gaffney cannot establish a *prima facie* case of unlawful discrimination on the bases of race and gender for their refusal to hire her for either Coordinator Position. The Court agrees.

As part of plaintiffs' *prima facie* cases in failure to hire claims, courts generally re-

quire that the plaintiff establish that she applied for the specific position but did not receive an offer. *See Walsh v. National Broad. Co.*, No. 83 Civ. 6102, 1987 WL 16131, at *3 (S.D.N.Y. Jan.7, 1987) (finding that plaintiff failed to establish a *prima facie* case of discriminatory failure to hire or transfer because he did not apply for the position); *Robertson v. Consol. Edison Co. of New York*, No. 94 Civ. 7396, 1997 WL 65905, at *7 (S.D.N.Y. Feb.13, 1997) (finding employer foreclosed from liability for failure to hire because plaintiff did not apply for the posted open position).

In the case at bar, the Coordinator Positions were officially posted, providing notice to Gaffney. Despite these official postings, Gaffney did not apply for either opening. Moreover, Gaffney has not alleged or established disparate treatment, such as showing that an ex-employee who did not apply for a vacancy with Defendants was nonetheless hired to fill that vacancy. Defendants assert, and the Court agrees, that Gaffney cannot establish a *prima facie* case for Defendants' discriminatory failure to hire for the Coordinator Positions because she did not apply for either position.

Gaffney asserts that Defendants have misinterpreted her claims concerning Defendants' hiring of the Content and Segment Coordinators. Gaffney admits that she is not asserting a discrete failure to hire action arising out of Defendants' filling the Coordinator Positions, but rather, that she is using Defendants' hiring of the Coordinator Positions for the narrow purpose of establishing an inference of discrimination and pretext in her discriminatory termination claim.

Accordingly, the Court concludes that to the extent the Complaint could be interpreted as asserting a claim by Gaffney for Defendants' failure to hire her on the bases of race or gender, Gaffney cannot establish a *prima facie* case because she did not apply for either position.

### 2. Stewart and Kalembwe's Claim that Defendants Unlawfully Terminated Their Employment on the Bases of Age and Race Discrimination

Defendants assert that Stewart and Kalembwe cannot establish *prima facie* cases of discriminatory termination because they cannot show that the circumstances surrounding their terminations give rise to a reasonable inference of discriminatory motive. The Court agrees.

### a. Stewart and Kalembwe Were Employees of DoITT and Crosswalks Under Title VII

There is an initial issue of whether, for the purposes of Title VII, Stewart and Kalembwe were employees of Crosswalks and DoITT at the time the MOU was discontinued, or whether they should not be considered employees of Crosswalks and DoITT because they were Foundation Employees paid on the Foundation Line. Title VII defines an employee as "an individual employed by an employer." 42 U.S.C. § 2000e(f). In applying this definition, courts use a two-part test. *See United States v. City of New York*, 359 F.3d 83, 91–92 (2d Cir.2004). First, as a threshold matter, the plaintiff must demonstrate that he received some form of direct or indirect remuneration from the putative employer. *See id.; see also Pietras v. Board of Fire Comm'rs of the Farmingville Fire Dist.*, 180 F.3d 468 (2d Cir.1999). Second, once a plaintiff establishes remuneration, courts "look to the thirteen factors articulated by the Supreme Court in *Community For Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) to determine whether an employment relationship exist[ed]." *City of New York*, 359 F.3d at 92 (citations and quotation marks

omitted). The factors for consideration pursuant to *Reid* include: the extent to which the hiring party controls the manner and means by which the worker completes his or her assigned tasks; the skill required; the sources of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. *See id.* (citations and quotation marks omitted). Although no single factor is dispositive, courts generally "place the greatest emphasis on the extent to which the hiring party controls the manner and means by which the worker completes his or her assigned tasks." *Id.* (citation and quotation marks omitted); *see Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 (2d Cir.2000).

■ Stewart and Kalembwe were employees of Crosswalks and DoITT under Title VII. First, drawing all inferences in favor of Plaintiffs, the remuneration threshold is met because DoITT transferred funds to Foundation for the salary and benefit payments of Foundation Line Employees. In this role, Foundation served as an administrator, compensated Stewart and Kalembwe with funds provided by DoITT.

Second, under a weighing of the *Reid* factors, Stewart and Kalembwe had employment relationships with DoITT. Stewart and Kalembwe's work was controlled by the Crosswalks supervisors and managers, who evaluated them, set and changed their schedules, assigned them projects, approved vacation requests, and provided training. Stewart and Kalembwe worked as Foundation Line Employees for over ten years, using Crosswalks' equipment during that time. Stewart and Kalembwe assert that, during their time at Crosswalks, DoITT and Crosswalks' managers had referred to Foundation Line Employees as employees of DoITT and Crosswalks. Accordingly, the Court concludes that, after drawing all reasonable inferences in favor of Plaintiffs, Stewart and Kalembwe may be treated as employees of DoITT and Crosswalks covered by Title VII.

b. *Analysis Under the McDonnell Douglas Framework of Stewart and Kalembwe's Discriminatory Termination Claims on the Bases of Age and Race*

■ Stewart and Kalembwe cannot establish *prima facie* cases of age and race discrimination based their employment terminations. Even assuming that Stewart and Kalembwe can establish the first three *prima facie* requirements, Stewart and Kalembwe cannot establish that the circumstances surrounding their terminations gave rise to a reasonable inference of discriminatory motive. Stewart and Kalembwe each signed Personnel Action Forms, which acknowledged that their continued employment as a Foundation Line Employee was subject to the availability of funding. DoITT and Crosswalks were required to reduce their salary expenditures, prompting them to adopt a reorganization strategy and discontinue the MOU. By discontinuing the MOU, all Foundation Line Employees were terminated, regardless of age or race. Stewart and Kalembwe have offered no evidence suggesting that similarly situated Foundation Line Employees were not terminated

when the MOU was discontinued, or that Defendants' discontinuance of the MOU was, even in part, motivated by age or racial discriminatory animus.

■ Stewart and Kalembwe's situation is distinguishable from Gaffney's termination claim. Business decisions to hire employees to fulfill specific needs in one area while downsizing another area during a reduction in force is generally not evidence of discrimination or pretext. *See Foxworth v. American Bible Soc'y*, No. 03 Civ. 3005, 2005 WL 1837504, at *7–9 (S.D.N.Y. July 28, 2005). Unlike Gaffney, Stewart and Kalembwe have not established evidence, for example, that Defendants were hiring additional employees into their departments during the reduction in force and reorganization or that Defendants' overall salary expenditures within their department were increasing.

The Court concludes that, drawing all reasonable inferences in favor of Stewart and Kalembwe, a rational jury could not find that the circumstances surrounding their terminations gave rise to a reasonable inference of age or race discrimination. Accordingly, Stewart and Kalembwe cannot establish a *prima facie* case for discriminatory termination on the bases of age or race.

3. *Kalembwe's Failure–to–Hire Claim on the Bases of Age and Race*

After his termination, Kalembwe applied for the MIS Position at DoITT, which was posted in March 2003. On April 16, 2003, DoITT interviewed Kalembwe, as well as three white males under the age of 40, but selected none for the position. Kalembwe produced evidence suggesting that Defendants, after interviewing Kalembwe, continued seeking qualified applicants to fill the MIS Position, which included: evidence that the vacant MIS Position was discussed at a senior staff meeting on Au-

gust 7, 2003 and that Defendants' senior management considered advertising options for the MIS Position; re-posting the MIS Position vacancy on March 16, 2004, which contained the same language as the March 2003 post; and considering Chris Ioinnello, who was listed as a potential candidate for the MIS Position on a May 13, 2004 chart. Ultimately, DoITT did not hire anyone for the MIS Position, outsourcing the position instead.

■ A plaintiff in a discriminatory failure-to-hire context must establish as part of his *prima facie* case that: (1) he is a member of a protected class; (2) he was qualified and applied for an open position for which the defendants were seeking applicants; (3) he was rejected for the position; and (4) that after plaintiff's rejection, the position remained open and the employer continued seeking applicants of plaintiffs' qualifications or that the position was offered to a person not in plaintiff's protected class, with the touchstone being whether the circumstances could reasonably be read as supporting an inference of discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817 (finding that plaintiff met his *prima facie* burden in part because the employer sought mechanics, which was plaintiff's trade, and continued to do so after plaintiff was rejected); *Marshall–Screen v. Internal Revenue Serv.*, No. 01 Civ. 811, 2002 WL 264999 (E.D.N.Y. Feb.26, 2002); *Berhanu v. New York State Ins. Fund*, No. 91 Civ. 4956, 1999 WL 813437, at *10 (S.D.N.Y. Oct.8, 1999).

■ Kalembwe has met his initial *prima facie* burden in his failure-to-hire claim based on age and race discrimination. The first three *prima facie* requirements are met because, as a black male over 40 years old at the time of the alleged failure to hire, Kalembwe was within a protected

class for both age and race, and he applied for, but was not offered, the MIS Position. *See O'Connor v. Consolidated Coin Caters ers Corp.*, 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (stating that the ADEA limits the protected class to those who are 40 years old or older); *Carter v. Cornell Univ.*, 976 F.Supp. 224, 231 (S.D.N.Y.1997) (finding black employee was the member of a protected class on the basis of race). Defendants assert that Kalembwe was not qualified for the MIS Position because he was unfamiliar with certain systems listed as requirements in the position's posting. Kalembwe counters that McKenna assured him that knowledge and experience with these systems were not prerequisites to be interviewed and considered for the position and that training opportunities were available. Also, Kalembwe occupied the Broadcast MIS Manager position at Crosswalks, and he asserts that this position had similar duties and responsibilities as the MIS Position. Kalembwe further asserts that McKenna, who was familiar with Kalembwe's education, work experience, and technical expertise, granted Kalembwe an interview, which could reasonably be read to suggest that Kalembwe possessed the basic skills and qualifications necessary for the position. *See Romain v. Cigna Life Ins. Co. of New York*, No. 01 Civ. 7228, 2002 WL 31385816, at *4 (S.D.N.Y. Oct.22, 2002).

■■■ Defendants assert that Kalembwe cannot establish an inference of discrimination because the MIS Position was never filled, meaning that Kalembwe cannot show disparate treatment. In failure-to-hire claims, proof of disparate treatment may be sufficient, but is not necessary, for establishing an inference of discrimination. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir.2001) (finding that plaintiffs need not present evidence of disparate treatment but instead may establish an inference of discrimination through direct evidence of the employer's words and actions). The Court concludes that a reasonable inference of discrimination was raised when DoITT interviewed Kalembwe, who met the basic qualifications for the position, but Defendants subsequently continued to actively seek similarly-qualified applicants for the MIS Position. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817; *Stokes v. Perry*, No. 94 Civ. 0573, 1997 WL 782131, at *4 (S.D.N.Y. Dec. 19, 1997) ("[I]t is the fact that a position remained unfilled even though the employer had considered a qualified candidate ... has the appearance of invidiousness."). Kalembwe has established sufficient evidence allowing a reasonable juror to conclude that, although he possessed the basic qualifications for the MIS Position, Defendants did not offer him the position and continued actively searching for new candidates with the same or similar basic qualifications, creating a reasonable inference of age and/or racial discrimination. Accordingly, Kalembwe has established a *prima facie* case for his failure-to-hire claim.

Defendants have not asserted a legitimate, nondiscriminatory reason for failing to hire Kalembwe or established evidence showing why they outsourced the MIS Position. Had Defendants met their burden of producing evidence supporting a nondiscriminatory reason, the burden of proving that such reason was false and a pretext for discrimination would shift to Kalembwe. Accordingly, Defendants have not met their intermediate burden of production, and the Court need not proceed with the pretextual analysis.

*4. Stewart's Failure–to–Hire Claims*

At various times from 1992 until 2003, Stewart performed the positions of MCO, Studio Production Director, Assistant Di-

rector, Studio Coordinator, and Camera Operator at Crosswalks. After his termination, Stewart applied for, but did not receive, four positions at DoITT, namely: ENG Supervisor, MCO, Nighttime Producer, and Camera Operator. Stewart claims Defendants' failure to hire him for each position was motivated by his race and/or age. The Court concludes that Stewart's claims fail because he has not met his burden of establishing both a *prima facie* case and showing that Defendants' lawful reasons were false and a pretext for unlawful discrimination.

### a. *ENG Supervisor*

■■ After discontinuance of the MOU, Stewart applied to DoITT for the open ENG Supervisor position, which is essentially a supervisor of field camera operators. Stewart did not receive an interview or an offer for this position. DoITT ultimately offered the position to Vigilante, a white male. The Court concludes that, even assuming Stewart can make a *prima facie* case, his claim that Defendants failed to hire him for the ENG Supervisor position fails because he cannot establish that Defendants' nondiscriminatory reason was pretext for discrimination.

Defendants, as part of their intermediate burden, assert that they hired Vigilante as opposed to Stewart because Vigilante, in their opinion, was significantly more qualified than Stewart. More specifically, Defendants assert that Vigilante possessed superior supervisory skills and experience, and that Vigilante, who was acting as the ENG Supervisor at the time of the MOU's discontinuance, performed adequately in this position.

Stewart asserts that Defendants' proffered nondiscriminatory reason was pretext for discrimination because Defendants preselected Vigilante for the ENG Supervisor role even before Stewart was interviewed. Stewart asserts that Delgado sent an email to Wierson on February 14, 2003 ("Preselection Email"), which stated that Defendants' human resources department needed to obtain resumes of the Foundation Line Employees that they thought "for sure" would be "filling up some of the openings," and that this list contained Vigilante's name among a list of ten names.[5] (Email from Delgado to Wierson, dated Feb. 14, 2003, attached as Ex. 38 to Pls.' 56.1.) Stewart and Kalembwe's names were not listed in the Preselection Email, and Defendants did not offer positions to any of the Foundation Line Employees who were not listed in the Preselection Email. Further, Stewart asserted that Defendants were having issues with Vigilante's job performance because, prior to discontinuance of the MOU, Defendants found it necessary to speak to Vigilante regarding "some issues" and that they needed to "straighten him out" regarding "attitude changes" and that he needed to "get his act together." (Wierson Deposition, dated June 9, 2006, attached as Ex. 12, p. 381–387 to Pls.' 56.1.)

Defendants counter that there was no preselection of particular candidates to fill particular openings. Defendants concede, however, that DoITT supervisors and managers were intimately familiar with the work and experience of the Foundation Line Employees, and that from this knowledge, Defendants had expectations as to who would be successful candidates.

---

5. The employees listed in the Preselection Memo included: Yocasta Delgado, Hispanic; Butler–Aleyande, black; Marc Amisial, black; Daniel Chong, Asian; Glenn Bevilacqua, white; Freddy Luna, Hispanic; Steven Vigi-lante, white; Roland LeBreton, white; Wiener Milien, black; and Agron Cekovic, white (collectively, the "Alleged Preselectees"). The Alleged Preselectees were all under the age of 40 at the time of the MOU's discontinuance.

The Court is not persuaded that a preponderance of the evidence demonstrates that Defendants' proffered nondiscriminatory reason was both false and pretextual. It is not the place of courts to substitute their judgment for that of employers, and the courts "must respect [employers'] unfettered discretion to choose among qualified candidates." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir.2001). Stewart has not presented evidence that Vigilante was unqualified for the ENG Supervisor position, or that Stewart was somehow more qualified for the position. Defendants were faced with a choice between two qualified candidates, and they chose Vigilante because, based on their knowledge and experience with both candidates, Vigilante was the most qualified.

Further, Stewart has not produced sufficient evidence suggesting that Defendants' proffered reason was pretext for discrimination. Although the evidence Stewart has put forth would allow a rational juror to conclude that Defendants preselected particular Foundation Line Employees prior to conducting interviews, this consideration alone, under the circumstances before the Court, does not demonstrate by a preponderance of the evidence that race or age discrimination were the real reasons behind Defendants' decision. Defendants' hiring decisions with respect to the Foundation Line Employees did not occur in a vacuum. Rather, Defendants were familiar with those ex-employees' skills, experiences, credentials, knowledge, and work ethic. A rational jury could assess the totality of the circumstances on the record and reasonably conclude that intuitively, it makes economic and business sense that, prior to discontinuing the MOU and posting the open positions, Defendants reflected upon the soon-to-be ex-employees, deciding who would make the best candidates for the future DoITT positions.

This consideration, in and of itself, does not constitute sufficient evidence that Defendants' hiring decisions were motivated either in whole or in part by unlawful discrimination because Stewart has not established a connection between Defendants' alleged preselection and their alleged unlawful discrimination. Stewart has not put forth sufficient evidence that would allow a rational juror to infer that the Alleged Preselectees were chosen because of their age or race or that Stewart was not included on that list because of his age or race.

Accordingly, Stewart has not demonstrated, by a preponderance of the evidence, that Defendants' proffered reasons for failing to hire him into the ENG Supervisor position were both false and pretext for unlawful discrimination.

b. *MCO*

At the time of the MOU's discontinuance, Stewart was working as an MCO, and he subsequently applied for an MCO position at DoITT. Defendants selected four candidates for the MCO positions, namely: Marc Amisial ("Amisial"), a 27–year–old male ex-Foundation Line employee who is black; Daniel Chong ("Chong"), a 28–year–old male ex-Foundation Line Employee who is Asian; Glenn Bevilacqua ("Bevilacqua"), a 27–year–old male ex-Foundation Line Employee who is white; and Lascelles Shaw ("Shaw"), a 30–year–old black male who was not previously employed by Defendants (collectively, the "MCO Selectees"). Stewart asserts that he was not granted an interview or selected for an MCO position. Even assuming that Stewart can establish a *prima facie* case, his claim fails because he cannot establish that Defendants' nondiscriminatory reason for not hiring him for the MCO position is both false and pretext for unlawful discrimination.

As their legitimate, nondiscriminatory reason, Defendants assert that they did not hire Stewart for the MCO position because the MCO Selectees had more experience and were more qualified than Stewart. McKenna, who had supervised and interviewed all of the MCO candidates, determined that the MCO Selectees all had more sophisticated server and automation experience than Stewart.

Stewart asserts that Defendants' stated reason for not hiring him is pretext for age and race discrimination. Stewart contends that Delgado sent an email to Wierson stating that Stewart was likely to apply for an MCO position and that they "know [Stewart] has more experience than [Amisial] and [Bevilacqua]...." (Email from Delgado to Wierson, dated Mar. 10, 2003, attached as Ex. 48 to Pls.' 56.1.) Stewart further disputes that the MCO Selectees had more sophisticated experience than he because, as an MCO at the time of the MOU's discontinuance, he was working with the same equipment as the MCO Selectees who had worked on the Foundation Line. Further, Stewart asserts that Amisial, Chong, and Bevilacqua, who were all listed in the Preselection Email, were preselected to fill the MCO positions before the positions were posted and interviews were conducted.

Defendants counter that, at his deposition, Stewart conceded that Amisial, Bevilacqua, and Chong all had more experience than himself. However, a review of the deposition transcript reveals significant confusion, with the attorney's question changing during Stewart's deposition from "[w]ho specifically [is Stewart] alleging had more experience" than him to "whether [Stewart] had more experience than they do," and in other areas of his testimony, Stewart said he had more experience and seniority than at least Bevilacqua. (Stewart Dep., attached as Ex. X, p. 286–287 to Pls.' 56.1.) This dispute raises an issue of material fact regarding whether Defendants' proffered nondiscrimnatory reason was false, or whether Defendants did believe that Stewart was more qualified for the MCO position than the MCO Selectees.

Stewart's MCO failure-to-hire claim still fails, however, because he has not established by a preponderance of the evidence that Defendants' reason was merely pretext for unlawful discrimination. Even assuming that Defendants' proffered reason was false, Stewart still has the burden of establishing that Defendants' real reason for not hiring him was on account of unlawful discrimination. *See Quaratino*, 71 F.3d at 58. Stewart again asserts that Defendants' alleged preselection establishes that the proffered reason was merely a pretext for discrimination, but as the Court stated above, under these circumstances, preselection alone does not sufficiently establish by a preponderance of the evidence that unlawful discrimination was Defendants' real reason. Accordingly, Stewart has not met his burden of establishing that Defendants' nondiscriminatory reason for failing to hire him as an MCO was merely pretext for unlawful discrimination.

c. *Nighttime Producer*

 After Defendants discontinued the MOU, Stewart applied for, but did not receive, the Nighttime Producer position at DoITT. Defendants assert that Stewart cannot establish an inference of discrimination from their failure to hire him into the Nighttime Producer position because they rescinded the posting and never sought to fill the position after it was posted. The Court agrees.

Stewart has not produced sufficient evidence showing that, after posting the Nighttime Producer position. Defendants had taken any significant steps towards

filling the position prior to withdrawing it. For instance, Stewart has not demonstrated that Defendants interviewed anybody, including himself, in an attempt to actively search and fill the Nighttime Producer position, nor has Stewart produced evidence showing that Defendants gave preferential treatment to applicants outside of his protected class. Instead, Stewart asserts that Defendants transferred the functions of the Nighttime Producer position to Butler–Aleyande. However, even assuming that this transfer took place, it would not reflect either racial or age discriminatory animus on the part of Defendants. Butler–Aleyande is a black male, and thus within Stewart's protected racial classification. Also, at the time of Defendants' failure to hire Stewart, Butler–Aleyande was 38 years-old, making him a mere five years younger, and thus, not substantially younger than Stewart. *See Spahr v. American Dental Ctrs.*, No. 03 Civ. 4954, 2006 WL 681202, at *5 (E.D.N.Y. Mar. 14, 2006) (finding that a five year age difference between plaintiff and her replacement did not, without more, create an inference of age discrimination because the replacement was not ('substantially younger')). Accordingly, Stewart has not produced sufficient evidence that would allow a rational juror to conclude that Defendants refused to hire him for the Nighttime Producer position under circumstances giving rise to a reasonable inference of unlawful discrimination.

The Court notes that this situation is distinguishable from Kalembwe's application for the MIS Position, discussed above in Part III.A.3, where even though Defendants never ultimately filled the position, the Court found circumstances giving rise to an inference of discrimination. In Kalembwe's situation, he applied, was qualified, and interviewed for the position, but despite his qualifications, Defendants did not offer him the position. Kalembwe further established evidence that after his interview, Defendants continued to actively seek candidates to fill the MIS Position, but that they ultimately decided to outsource the position, leaving it unfilled. In Kalembwe's situation, the Court concluded that Defendants' act of continuing to actively search for a candidate to fill the position after interviewing Kalembwe, who was a qualified candidate, sufficiently raised an inference of discrimination. However, as regards the Nighttime Producer position, Stewart has not established that he received an interview for the position but did not receive an offer, or that Defendants actively sought to fill the position after Stewart applied. Thus, a rational juror could not draw an inference of discrimination from Defendants' actions in the Nighttime Producer context. Accordingly, Stewart has not established a *prima facie* case for Defendants' alleged discriminatory failure to hire him as a Nighttime Producer.

Additionally, even assuming that Stewart could establish a *prima facie* case, his claim would still fail because he cannot establish pretext. Defendants' have presented sufficient evidence demonstrating that their legitimate, nondiscriminatory reason for failing to hire Stewart as a Nighttime Producer was that, after posting the position, they no longer believed it was in the best interest of the ongoing reorganization effort to employ another Nighttime Producer, choosing instead to withdraw the posted position. Stewart has produced no evidence that Defendants' revocation of the Nighttime Producer position was prompted by discriminatory animus. As stated above, Stewart's assertion that Defendants transferred the functions of the Nighttime Producer to Butler–Aleyande, a 38–year–old black male, belies Stewart's claim of racial and age discrimi-

nation. Further, as in the *prima facie* discussion above, Stewart has proffered no evidence from which a jury may reasonably infer that Defendants' decision to withdraw the posted position was in any way based on Stewart's age. Accordingly, Stewart has failed to demonstrate that Defendants' nondiscriminatory reason for withdrawing the posted Nighttime Producer position was false and pretext for unlawful discrimination on the bases of age and/or race.

### d. *Camera Operator*

 After Defendants discontinued the MOU, Stewart applied and was interviewed for a Camera Operator position, but he was not selected. Defendants assert that two candidates were selected, a black male and a Hispanic male. Stewart claims that the Hispanic male turned down the offer, and that Defendants have omitted that, in addition to the black and Hispanic candidates selected, Defendants also hired three white candidates for the Camera Operator positions. Stewart claims that the successful candidates who accepted Camera Operator positions included: Agron Cekovic ("Cekovic"), a white ex-Foundation Line Employee who was 28 years old at the MOU's discontinuance; Wiener Milien ("Milien"), a black ex-Foundation Line Employee who was 33 years old at the MOU's discontinuance; and Elliot Stern ("Stern") and Conrad Stojak ("Stojak"), whose racial classifications were not clear from the record, were 24 and 28 years old respectively at the MOU's discontinuance, and they were hired from outside Crosswalks. Even assuming Stewart can establish a *prima facie* case, his claim still fails because he cannot show by a preponderance of the evidence that Defendants' nondiscriminatory reason was both false and pretext for discrimination.

Defendants have met their burden of producing evidence of a nondiscriminatory reason for not hiring Stewart. Specifically, Defendants provided testimony that Stewart's camera operation skills, knowledge, and experience, relative to the successful candidates, were outdated due to technology upgrades and the passage of time. According to Defendants, Stewart had not done camera work since 1998, which was exclusively with analog technology that was four to five generations old at the time of the interview. In addition to lacking experience, Defendants asserted that Stewart did not have proper knowledge and skills regarding digital technologies. Also, unlike the other candidates interviewed, Stewart did not submit a reel of his work to discuss with the interviewers.

Stewart asserts that Defendants' nondiscriminatory reasons are pretext for racial discrimination because, in the months prior to the MOU's discontinuance, McKenna asked Stewart to operate a camera a couple days a week. Stewart asserts that this contradicts that Defendants believed that Stewart was unable to perform the position because of camera upgrades and the passage of time. Further, Stewart asserts that he is at least equally qualified for Camera Operator as the successful candidates. Stewart asserts that Cekovic was included in the Preselection Email, and that his resume did not list familiarity with DVC–Pro, the technology that Crosswalks was adopting at the time of hiring, or proficiency with other digital systems. Stewart asserts that Stern's resume primarily lists production assistant, but that he did have camera experience with main events. Stewart asserts that, at the time of the MOU's discontinuance, Stojak had only one year's worth of experience operating a camera. Stewart further contends that Milien was also included in the Preselection Email, and that Stewart performed

the same type of work as Milien, rendering the two with comparable skills and knowledge. Further, Stewart asserts that during his interview for the Camera Operator position, McKenna did not inquire as to what type of cameras he was familiar with.

Defendants counter that it is inappropriate for the Court to second-guess their assessment of Stewart's skills and abilities compared to those of the successful candidates because Title VII and the ADEA obligate Defendants only to base their actions on nondiscriminatory considerations. *See Scaria v. Rubin,* 117 F.3d 652, 655 (2d Cir.1997) (finding summary judgment appropriate because the employer is within its right to favor experience over education and there was nothing within this value judgment that was pretextual). In fact, "an employer's judgment in selecting and applying subjective criteria may be poor, and it may be erroneous as long as it is not discriminatory" and the nondiscriminatory reasons "need not be well advised" but merely truthful and not pretext for unlawful discrimination. *Gilman v. Runyon,* 865 F.Supp. 188, 193 (S.D.N.Y.1994) ("Evidence that an employer made a poor business judgment in discharging an employee is generally insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons.") (citations and quotation marks omitted).

In the case at bar, Stewart has not established that Defendants' proffered nondiscriminatory reason was pretext for a discriminatory motive. Although Stewart disagrees with and puts forth evidence that could possibly show that Defendants made a poor business decision to hire other candidates over him, Stewart has not demonstrated by a preponderance of the evidence that Defendants' stated reasons were untruthful and that they were merely pretext for unlawful discriminatory motives.

### 5. *Stewart and Kalembwe's Retaliation Claims*

In order to establish a *prima facie* case under Title VII's anti-retaliation provision, a plaintiff must establish the following factors: (1) participation in a protected activity; (2) knowledge by plaintiff's employer of the protected activity; (3) that plaintiff suffered a materially adverse action; and (4) that there is a causal connection between the protected activity and the materially adverse action. *See Thomas v. iStar Fin., Inc.,* 438 F.Supp.2d 348, 364 (S.D.N.Y.2006). If the plaintiff establishes a *prima facie* case of retaliation, then an inference of discrimination is created and the burden shifts to defendant to provide a legitimate non-retaliatory reason for the alleged adverse action. *See Treglia v. Town of Manlius,* 313 F.3d 713, 721 (2d Cir.2002). If the defendant establishes a non-retaliatory reason, then the "plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *See id.* (citations and quotation marks omitted).

The analytical framework described above also "applies to retaliatory claims under the New York State and New York City Human Rights Laws." *Hernandez v. New York City Law Dep't Corp. Counsel,* 94 Civ. 9042, 1997 WL 27047, at *13 (S.D.N.Y.1997); *see also Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714–15 (2d Cir.1996). The parties have not asserted that, under the circumstances of the instant action, analyzing Stewart and Kalembwe's retaliation claims under state or city laws would lead to different legal conclusions or outcomes compared to analysis under Title VII's anti-retaliation provision.

#### a. *Stewart and Kalembwe's Unlawful Retaliation Claim Based on Defendants' Failure to Rehire Them*

In the case at bar, Stewart and Kalembwe assert that Defendants, at least in part, failed to rehire them based on retaliatory animus flowing from the 1997 and 1998 Cases. Defendants do not dispute that Stewart and Kalembwe satisfied the first and third *prima facie* requirements by bringing earlier civil rights actions against Crosswalks and DoITT and suffering adverse employment actions when neither were offered any of the employment positions for which they applied. Further, at depositions, members of Defendants' management testified that they were aware of the 1997 and 1998 Cases, satisfying the second *prima facie* requirement.

Defendants, however, assert that Stewart and Kalembwe cannot establish a *prima facie* case because they cannot establish a causal connection between the protected activities and their failures to be hired. Proof of a causal connection can be established indirectly by showing either of the following: (1) that the protected activity was followed closely by discriminatory treatment; or (2) through other evidence such as disparate treatment of fellow employees who engaged in similar conduct. *See DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.1987). Additionally, the connection may be established directly through evidence of retaliatory animus directed against Stewart and Kalembwe by Defendants. *See id.*

Stewart and Kalembwe have not submitted sufficient evidence that would allow a causal connection to be established indirectly. The 1997 and 1998 Cases ended at least seven months prior to Defendants' failure to hire them, resulting in insufficient temporal proximity to establish a causal connection indirectly. *See, e.g.,*

*Carr v. Westlb Admin., Inc.,* 171 F.Supp.2d 302 (S.D.N.Y.2001) (finding that, although there is no bright line rule, a four-month lapse of time was insufficient to draw a temporal causal connection). Further, Stewart and Kalembwe have not put forth any evidence of disparate treatment.

Stewart and Kalembwe, however, have put forth sufficient direct evidence of retaliatory animus establishing a causal connection between their protected activity and Defendants' failure to hire them. On March 10, 2003, prior to the posting of the open positions at DoITT, in an email exchange between Wierson and Delgado ("Delgado Email"), Delgado mentions the possibility of another lawsuit in connection with Stewart and Kalembwe not getting positions with DoITT after the discontinuance of the MOU. At Delgado's deposition, she stated that the portion of the Delgado Email referring to a potential lawsuit by Stewart and Kalembwe was meant as a joke because she knew of 1997 and 1998 Cases. Wierson did not criticize, deny, or express disapproval of Delgado's comments within the Delgado Email chain. Further, McKenna, testifying at his deposition as to why he did not recommend Stewart for a position at DoITT, stated that he "didn't want [Stewart] to infect the ENG crew ... stirring up resentment," and that Stewart "was a little bit of a rabble rouser" who "wouldn't let go of the past" ("McKenna's Statements"). (McKenna Deposition, dated May 9, 2006, attached as Ex. 23, p. 122–123 to Pls.' 56.1.) The Court concludes that Stewart and Kalembwe have produced sufficient evidence suggesting a causal connection between their protected activity and their failures to be rehired, creating circumstances from which a reasonable jury could infer retaliatory intent on the part of Defendants. Accordingly, Stewart and Ka-

lembwe have established *prima facie* cases for violation of Title VII's anti-retaliation provision.

Defendants have the burden of producing evidence establishing a legitimate, nondiscriminatory reason for failing to hire Stewart and Kalembwe. As in Part III.A.3 of this opinion, Defendants have failed to produce evidence and assert a legitimate, nondiscriminatory reason for failing to hire Kalembwe for the MIS Position, rendering it unnecessary for the Court to proceed with the pretextual analysis for Kalembwe's failure-to-hire claim on the basis of retaliatory animus.

Defendants, as discussed in greater detail in Parts III.A.4.a-d above, have sufficiently established evidence of legitimate, nondiscriminatory reasons for not hiring Stewart for the ENG Supervisor, MCO, Nighttime Producer, and Camera Operator positions respectively. Stewart, primarily through Delgado's Email and McKenna's Statements, has established sufficient evidence allowing a rational juror to conclude that Defendants' stated reasons were false and a pretext for retaliatory animus. Accordingly, a rational juror could conclude that the comments of Delgado, Wierson, and McKenna reflect a retaliatory animus on the part of Defendants to not rehire Stewart for any of the positions for which he applied, at least in part, on the basis of retaliatory animus.

b. *Stewart and Kalembwe's Unlawful Retaliation Claim Based on Defendants' Terminating Their Employment*

 Stewart and Kalembwe's retaliation claim based on Defendants' terminating their employment fails because Stewart and Kalembwe have not produced sufficient evidence establishing a causal connection between the 1997 and 1998 Cases and their terminations. Unlike in

Stewart and Kalembwe's the failure-to-hire claims, they have not produced direct evidence of Defendants' retaliatory animus in connection with their termination. The comments of Delgado, Wierson, and McKenna that gave rise to a causal connection in the failure-to-hire context are not applicable in Stewart and Kalembwe's termination claim based on retaliation. The Delgado Email and McKenna's Statements were limited to Defendants' decisions not to rehire Stewart and Kalembwe and did not reference any intent on behalf of Defendants to terminate Stewart and Kalembwe's employment based on the 1997 and 1998 Cases or other unlawful retaliatory animus.

Further, Stewart and Kalembwe cannot establish a causal connection based on indirect evidence because there was insufficient temporal proximity and no evidence of disparate treatment. As the Court concluded above, the seven-month gap between the close of the 1997 and 1998 Cases and Stewart and Kalembwe's termination is insufficient on its own to support a causal connection based on temporal proximity. *See, e.g., Wayne v. Principi,* No. 01 Civ. 941, 2004 WL 389009, at \*13 (S.D.N.Y. Mar. 3, 2004) (finding a three-month period between protected activity and an adverse act was insufficient to establish a causal connection). Stewart and Kalembwe have not produced evidence of disparate treatment, such as pointing to an employee on the Foundation Line who did not bring a civil rights claim against Defendants and was not terminated when the MOU was discontinued. Rather, Defendants terminated all Foundation Line Employees regardless of whether they had previously filed civil rights complaints against Defendants.

Stewart and Kalembwe have not shown through either direct or indirect evidence that their involvement in the 1997 and

1998 Cases had a causal connection with their terminations. Accordingly, Stewart and Kalembwe have not established a *prima facie* case for discriminatory termination on the basis of unlawful retaliation.

### 6. *Kalembwe's Discrimination Claims on the Basis of Disability*

Kalembwe asserts that Defendants discriminated against him based in part on his diabetic condition, in violation of the ADA, NYSHR, and NYCAC.

### a. *Kalembwe's ADA Claim*

The ADA prohibits an employer from discriminating against an employee "because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees...." 42 U.S.C. § 12112(a). Plaintiffs bear the initial burden of establishing a *prima facie* case of discrimination under the ADA by showing that: (1) the employer is covered by the ADA; (2) the employee has a disability within the meaning of the ADA; (3) the employee was qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) the employee suffered an adverse employment action because of his disability. *See Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998). Defendants assert that Kalembwe's ADA discrimination claim must fail because he has not produced sufficient evidence showing that he is disabled within the meaning of the ADA. The Court agrees.

■ For an individual to have a disability within the meaning of the ADA, that individual must have a "a physical or mental impairment that substantially limits one or more of [that person's] major life activities...." 42 U.S.C. § 12102(2)(A). Physical impairments, by themselves, will not necessarily constitute a disability under the ADA, but rather, the plaintiff must demonstrate how the physical impairment substantially limits at least one major life activity, such as caring for oneself, performing manual tasks, walking, hearing, speaking, breathing, learning, and working. *See Hazeldine v. Beverage Media, Ltd.,* 954 F.Supp. 697, 703, 703 n. 1 (S.D.N.Y.1997) (finding that although employee's morbid obesity affected her ability to engage in everyday activities, it did not rise to the level of substantially limiting a major life activity within the ADA's meaning). An individual who is "substantially limit[ed]" under the ADA must be "[u]nable to perform a major life activity that the average person in the general population can perform" or be "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity" compared to the average person. 29 C.F.R. § 1630.2(j)(1); *see also Hazeldine,* 954 F.Supp. at 703. Whether a person has a disability limiting a major life activity under the ADA is an individualized inquiry. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment ... but rather on the effect of that impairment on the life of the individual."); *see also Sutton v. United Air Lines,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

■ Kalembwe asserts that his diabetic condition has substantially affected major life activities because his diabetes causes fatigue and he may fall asleep without warning for five or ten minutes, impairing major life activities such as walking, seeing, hearing, breathing, and working. This assertion, however, is belied by Kalembwe's own testimony. At his deposition, Kalembwe testified that his diabetic condition did not affect any major life activities, including his ability

to work, and that only his eating habits are affected. (*See* Deposition of Polycarpe Kalembwe, dated May 11, 2006, attached as Ex. R, p. 99 to Defts.' 56.1.) Kalembwe further testified that the only affects from his diabetic condition are fatigue and falling asleep, which occurs approximately once every nine to eleven months, and Kalembwe admits that Defendants honored the only accommodation he requested, which was for supervisors to be patient with him if he fell asleep for five or ten minutes. *See id.* at 96, 120. Under the circumstances in the instant case, considering the frequency, magnitude, symptoms, and Kalembwe's own perception of his condition, the Court is not persuaded that Kalembwe's diabetic condition substantially limited a major life activity, and thus, does not constitute a disability Kalembwe suffered within the ADA's meaning. Accordingly, Kalembwe has not established a *prima facie* case of discrimination on the basis of a disability under the ADA.

### b. Kalembwe's Disability Claims Under NYSHR and NYCAC

In addition to his disability claim under the ADA, Kalembwe also brought disability claims pursuant to the Local Laws. The Local Laws apply the same *prima facie* elements and legal analysis as the ADA. *See Adams v. Master Carvers of Jamestown, Ltd.*, 91 Fed.Appx. 718 (2d Cir.2004) ("The elements of a prima facie case and the pretext analysis of ADA claims are also applicable in claims under the [NYSHR]."); *Branson v. Ethan Allen, Inc.*, No. 02 Civ. 6588, 2004 WL 2468610, at *7 (E.D.N.Y. Nov. 3, 2004) (finding that "the same legal analysis applies when assessing disability discrimination claims under either the NYCAC or the [NYSHR]"). Defendants in the instant case assert that Kalembwe cannot establish a *prima facie* case under the Local Laws because he: is

not suffering from a disability covered under the Local Laws; was not qualified to perform the essential functions of his job, with or without reasonable accommodation; and did not suffer an adverse employment action because of his disability. The Court concludes that Kalembwe has established a *prima facie* case under the Local Laws for Defendants' alleged discriminatory failure to hire him for the MIS Position, but that Kalembwe has not established a *prima facie* case for his discriminatory termination claim.

### i. Kalmebwe's Failure–to–Hire Claim Based on a Disability Under the NYSHR and NYCAC

▮▮▮▮ Kalembwe has established a *prima facie* case under the Local Laws for Defendants' failure to hire him for the MIS Position. First, Defendants have submitted no evidence suggesting that they are not covered by the Local Laws. Second, although the Court concluded that under the circumstances presented here, Kalembwe's diabetic condition was not a disability within the meaning of the ADA, courts have construed the NYSHR's definition of disability more broadly. *See State Div. of Human Rights v. Xerox Corp.*, 65 N.Y.2d 213, 491 N.Y.S.2d 106, 480 N.E.2d 695, 698 (1985) ("*Xerox*"); *Reeves*, 140 F.3d at 154–55. Under the NYSHR, the term "disability" means "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which ... is demonstrable by medically accepted clinical or laboratory diagnostic techniques...." N.Y. Exec. Law § 292(21) (McKinney's 2007). Unlike the under the ADA, plaintiffs need not establish that their condition affects a major life activity in order to be protected under the NYSHR. *See Xerox*, 491 N.Y.S.2d 106, 480 N.E.2d at 698. Courts applying New

York law generally find diabetes as a disability under the NYSHR. *See, e.g., Novak v. Royal Life Ins. Co. of New York,* 284 A.D.2d 892, 726 N.Y.S.2d 784 (App. Div.3d Dep't 2001); *Kelly v. Town of North Hempstead,* 103 A.D.2d 767, 477 N.Y.S.2d 396 (App. Div.2d Dep't 1984). Kalembwe's diabetic condition is a medical impairment resulting from a physiological condition that has been diagnosed and medically accepted, and thus, it is a disability under the NYSHR. As for the final two *prima facie* requirements, as the Court previously discussed in greater detail, Kalembwe possessed the basic qualifications to perform the MIS Position and Defendants' failure to hire him, yet continue to search for candidates who held the same basic qualifications, sufficiently demonstrated evidence that would allow a rational juror to conclude that he was not hired because of his disability. Accordingly, Kalembwe has established a *prima facie* case under the Local Laws for his discriminatory failure-to-hire claim based on his diabetic condition.

Since, as the Court previously stated, Defendants have not asserted a nondiscriminatory reason for failing to hire Kalembwe or established evidence showing why they outsourced the MIS Position, they have not met their burden of producing evidence of a legitimate nondiscriminatory reason for not hiring Kalembwe. Accordingly, the court need not proceed with the pretextual analysis.

 ii. *Kalembwe's Termination Claim Based on a Disability Under the NYSHR and NYCAC*

■ Kalembwe has not established a *prima facie* case for discriminatory termination under the Local Laws. Kalembwe, and the others who were employed under the MOU, were terminated when Defendants discontinued the MOU because of budget constraints. Kalembwe has not produced sufficient evidence that would allow a rational juror to conclude that his termination was a result of his diabetic condition. Accordingly, Kalembwe has not established a *prima facie* case for discrimination under the NYSHR and NYCAC with regard to his claim of discriminatory termination on account of his diabetic condition.

 7. *Section 1981 and 1983 Claims*

■ Municipalities are not liable under §§ 1981 and 1983 for injuries inflicted solely by its employees or agents. *See Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Jett v. Dallas Indep. School Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (stating that claims brought under §§ 1981 and 1983 are examined under the same analytical framework). However, "[m]unicipalities may be held liable for depriving individuals of their constitutional 'rights, privileges, or immunities,' if the deprivation proximately results from 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers' explicitly or by the municipality's custom and practice." *Walton v. Safir,* 122 F.Supp.2d 466, 477 (S.D.N.Y.2000) (*quoting Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). A "persistent and widespread" practice of a municipalities' officials could also be "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691, 98 S.Ct. 2018 (citations and quotation marks omitted). Further, when subordinate employees are alleged to have created a persistent and widespread practice, the subordinates' actions "must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 871 (2d Cir.1992).

The City asserts that Plaintiffs' §§ 1981 and 1983 claims fail as a matter of law because, to the extent that Plaintiffs have established constitutional violations, they cannot point to any evidence in the record showing that DoITT or the City has a custom or policy of discriminating against protected individuals.

Plaintiffs counter that their injuries resulted from an official policy of an agency of the City. Plaintiffs assert that Wierson, along with other high ranking officials at DoITT, developed or approved plans at meetings for a reduction in force and restructuring in such a way as to remove certain employees, as Gaffney alleges, based upon discriminatory reasons. Plaintiffs further assert that in addition to meeting with DoITT officials, Wierson brought particular actions with regard to the restructuring to the attention of DoITT's highest management levels, including DoITT's Commissioner Gino Menchini. These actions included allegedly submitting to Menchini a list of the proposed Crosswalks employees to be laid off, and Plaintiffs assert that after this list was submitted to Menchini, Merlino, the white female on the list who commanded a salary nearly $20,000 more than Gaffney, was removed from the list and retained. Further, Plaintiffs assert that DoITT's Human Resources Department participated in the alleged discriminatory actions by, for example, working with Delgado to post vacancy notices for producer positions at the time of Gaffney's termination, thereby facilitating the alleged discrimination. Plaintiffs also assert that at the time of their terminations, there were no black individuals in DoITT and Crosswalks' higher management, and that no white person at Crosswalks lost his job as a result of the reduction in force, the restructuring, or discontinuance of the MOU.

The Court is persuaded that a genuine issue of material fact exists regarding whether DoITT, through the actions alleged by Plaintiffs and to the extent that Plaintiffs can prove individual constitutional violations, had an official policy of discrimination. Although Plaintiffs have not established any direct evidence that DoITT had an express official policy to discriminate, the Plaintiffs have proffered evidence of concerted official actions from which a rational juror may infer an official policy. A rational juror could conclude that DoITT's senior management, including Commissioner Menchini, authorized, executed and oversaw DoITT's restructuring policies in a manner that resulted in unlawful discriminatory treatment of Plaintiffs. Accordingly, the Court is persuaded that, to the extent that Plaintiffs may prove that they suffered constitutional violations, a rational juror could conclude that the City, during the reduction in force, the restructuring, and the termination of the MOU, had a persistent and widespread practice of discrimination as it pertained to the management and operation of DoITT.

## IV. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion (Docket No. 30) of defendants the Department of Information Technology and Telecommunications ("DoITT"), NYC–TV, City of New York (the "City"), Arick Wierson, Yocasta Delgado, Walter Garaicoa, Michael McKenna, and Seth Unger (collectively, "Defendants") is GRANTED as to plaintiff Robin Gaffney's ("Gaffney") failure-to-hire claim as a Content or Segment Coordinator and her claim that she was terminated on the basis of unlawful gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, Executive Law § 290 *et seq.* ("NYSHR"), and the Administrative Code of the City of New York § 8–101 *et seq.* ("NYCAC"); and it is further

**ORDERED** that Defendants' motion (Docket No. 30) is GRANTED as to the claims of Polycarpe Kalembwe ("Kalembwe") and Albert Stewart ("Stewart") that they were terminated on the bases of age and race discrimination in violation of Title VII, NYSHR, NYCAC, and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA"); and it is further

**ORDERED** that Defendants' motion (Docket No. 30) is GRANTED as to Stewart's claim that he was not hired for the Electronic News Gathering Supervisor, Master Control Operator, Nighttime Producer, and Camera Operator on the bases of age and race discrimination in violation of ADEA, Title VII, NYSHR, and NYCAC; and it is further

**ORDERED** that Defendants' motion (Docket No. 30) is GRANTED as to the claims of Stewart and Kalembwe that Defendants terminated their employment in violation of the anti-retaliation provision in Title VII, NYSHR, and NYCAC; and it is further

**ORDERED** that Defendants' motion (Docket No. 30) is GRANTED as to Kalembwe's discrimination claims on the basis of disability under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* and his discriminatory termination claims on the basis of a disability under the NYSHR and NYCAC; and it is further

**ORDERED** that Defendants' motion (Docket No. 30) is DENIED as to Gaffney's claim that she was terminated on the basis of race in violation of Title VII, NYSHR, and NYCAC; and it is further

**ORDERED** that Defendants' motion (Docket No. 30) is DENIED as to Kalembwe's claim that Defendants failed to hire him for the Broadcast MIS Administrator position on the bases of his age and/or race in violation of Title VII, ADEA, NYSHR, and NYCAC; and it is further

**ORDERED** that Defendants' motion (Docket No. 30) is DENIED as to the claims of Stewart and Kalembwe that Defendants failed to hire them because of retaliatory animus in violation of Title VII, NYSHR, and NYCAC; and it is further

**ORDERED** that Defendants' motion (Docket No. 30) is DENIED as to Kalembwe's failure-to-hire claim based on a disability under the NYSHR and NYCAC; and it is further

**ORDERED** that Defendants' motion (Docket No. 30) is DENIED as to the claims of Gaffney, Stewart, and Kalembwe against the City under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1983, to the extent that Plaintiffs may, in accordance with this Decision and Order, establish that the City violated their civil rights. **SO ORDERED.**